UNITED STATES of America, Plaintiff,

v.

**Larry Lee EVERETT, Defendant.**

**Mag. No. 96–2106–M–RLH.**

United States District Court,
D. Nevada.

June 25, 1997.

Daniel D. Hollingsworth, Las Vegas, NV, for U.S.

James Connell, Las Vegas, NV, for Larry Lee Everett.

## DECISION AND ORDER

HUNT, United States Magistrate Judge.

Defendant Everett is charged, by complaint, with Operating a Motor Vehicle Under the Influence of Drugs and Speeding. Trial on those charges began on July 31, 1996. During the course of the trial, the Government called as its lead witness Ranger James Bates of the National Park Service (NPS). In the course of the Government's efforts to establish Ranger Bates' credentials as an "expert" on the use of a Drug Recognition Evaluation (DRE) protocol, Defendant objected on the basis that the proffered testimony fell within the parameters of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995), and did not meet the criteria for admissibility laid down by those cases.

A motion for a *Daubert* hearing was made. Defendant also moved for discovery prior to the hearing (the written motion was filed October 31, 1996). The trial was interrupted for the purpose of resolving the dispute and the issues raised. The parties were given extensions of time to gather, from the far parts of the country, any relevant information, documentation or testimony which might illuminate the subject. The Government responded with a Brief to Allow Testimony Regarding the Drug Recognition Expert Examination (DRE) Under *Daubert* (Filed January 24, 1996). A Reply Brief was filed by the Defendant (on March 24, 1997). Defendant also filed an Opposition to Brief ... on April 18, 1997. In connection with the foregoing documents, the parties have submitted extensive exhibits, including the DRE training materials, various studies, reports, articles, papers delivered at conventions, excerpts from medical literature, and extensive testimony of experts,[1] on behalf of the prosecution and the defense, from, *inter alia*, the case of *State of Minnesota v. Klawitter* (the decision of the Minnesota State Court which affirmed the trial court is found at 518 N.W.2d 577 (1994)). The parties' exhibits fill three large binders each.

After the Court had had an opportunity to digest the briefs and the exhibits, a hearing was on conducted on June 4, 1997.

## BACKGROUND

### I. HISTORY OF THE CASE

On May 27, 1996, near mile marker 38 on the North Shore Drive, within the boundaries of the Lake Mead National Recreation Area, Ranger Bates observed a Mazda pickup, driven by Defendant Everett, traveling southbound at a speed of 70 miles an hour (according to the Ranger's radar unit) in a 50–mile–an–hour zone. The Ranger effected a traffic stop. While talking to Defendant Everett he noticed his eyes were extremely red (pink coloring all over them), his mouth appeared dry, "extreme cotton mouth," and the Defendant was "semi-nervous." Suspecting intoxication, the Ranger began questioning Mr. Everett further and conducted the usual field sobriety tests (FST): horizontal gaze nystagmus (HGN) test, a "Rhomberg" test (the subject tilts the head back, closes his eyes and tries to estimate when 30 seconds have expired), a walk-and-turn test, a one leg stand test and a finger-to-nose test.

Defendant denied being drunk. This was confirmed by a breath screening device and was consistent with the Ranger's determination that the HGN was normal. However, other indicators from Everett's performance of the other FST's lead Ranger Bates to believe Defendant was under the influence of a drug or drugs, rather than alcohol. Accordingly, Ranger Bates took the Defendant to the Echo Bay Ranger Station and conducted a Drug Recognition Evaluation. Following that battery of tests, the Ranger concluded that Defendant Everett was under the influence of marijuana. Mr. Everett admitted he had used marijuana, "but not today." The Ranger arrested the Defendant on the foregoing charges.

---

1. The testimony of the following were presented in this manner: For the prosecution: Thomas E. Page, LAPD, supervisor of the department's DRE program; Marcelline Burns, Ph.D., a forensic psychologist; David O. Peed, O.D., trained as a field sobriety test instructor; Zenon Zuk, M.D., jail physician for City of Los Angeles; and Eugene Adler, toxicologist from Arizona. For the defense: Dr. Miles Belgrade, a neurologist; Dr. John Morgan, a pharmacology professor in New York; Dr. Paul Pentel, a Minnesota physician; and Jeffrey S. Janofsky, a forensic psychiatrist.

## II. DRUG RECOGNITION EVALUATION

The Drug Evaluation and Classification Program (DEC) (alternatively called the Drug Recognition Evaluation (DRE)Program), was developed by the Los Angeles Police Department (LAPD) during the 1970's and early 1980's. It was prompted by the fact that police officers often encountered situations where they suspected driver impairment due to drugs other than alcohol. Statistics showed, in studies conducted in metropolitan areas, that among fatally injured drivers, 19–37% of them had marijuana in their system and 8–20% had cocaine. (In roughly one-half of fatally injured drivers alcohol is a factor.) Although there had been developed techniques to detect impairment by alcohol, the officers lacked the tools necessary to validate their suspicions about other drugs.

By the early 1980's, LAPD had developed and implemented a program to train police officers to recognize the behavioral and physiological symptoms associated with major classes of psychoactive drugs. The police officers who completed the training were deployed as "Drug Recognition Experts" and were soon accepted as offering expert testimony in the Los Angeles court system. In the early 1980's the National Highway Traffic Safety Administration (NHTSA) became aware of the LAPD program and began supporting research, development and implementation activities relating to the DEC.

In 1984, NHTSA and the National Institute on Drug Abuse sponsored a laboratory study at Johns Hopkins University, which indicated that the LAPD DREs were highly accurate in identifying persons who had been given doses of drugs, and in identifying the class of drugs involved. A subsequent field study in Los Angeles showed the DREs were correct 94% of the time they judged a suspect to have used drugs other than alcohol and were able to correctly identify at least one drug class in 87% of the persons they evaluated.

With these initial positive results, the NHTSA, in conjunction with the LAPD, developed and tested a standardized curriculum to train the DREs. In 1987 the program began to be expanded. In that year the International Association of Chiefs of Police became the national certifying agency for DREs and instructors, and ultimately established standards for recertification as well. In 1989 a National Technical Advisory Panel was created to ensure the program and training standards were kept current. Criteria were adopted for participation by states or metropolitan areas, and the program has since expanded into areas involving over half of the states (at least 29), with a 300% increase in participating agencies since 1991, according to a recent article. Further tests and studies have occurred and are apparently ongoing. Statistics are attempting to be compiled and evaluated.

The DEC program consists of a standardized evaluation conducted by a Drug Recognition Examiner [2] (DRE), plus a toxicological analysis of a biological specimen (usually derived from either urine or blood). The DRE is usually not the arresting officer. Rather, the arresting officer brings the subject to a location where the DRE is located. The DRE then initiates the following twelve steps of the standardized protocol:

1. Breath alcohol test (to verify alcohol was not a factor)

2. Interview of arresting officer by DRE to obtain information about the arrest, actions and statements made by the subject, plus the arresting officer's observations.

3. Preliminary examination and first pulse reading

4. Eye examination, including nystagmus and convergence tests;

5. Motor skills test, also referred to as divided attention tests or field sobriety tests

6. Blood pressure, temperature, and second pulse reading

---

**2.** The term "examiner" is used alternatively with the term "expert" and seems to have become the term of choice among most people addressing the program. Expert seems a little presumptuous and possibly invades the province of the court in determining just who are experts. This Court prefers the use of examiner for reasons that should become clear in this Court's evaluation of this issue.

7. Pupil measurement under four lighting conditions and an "ingestion examination," checking the suspect's nose and mouth for signs of inhalation or smoking

8. Examination of muscle rigidity

9. Inspection for injection sites and third pulse reading

10. Interrogation, suspect statements, and other observations

11. Integration of all information as basis for evaluator's opinion

12. Toxicological examination.

The evaluation is designed to examine the subject's appearance, behavior, eyes, performance of the field sobriety tests, vital signs, and questioning of the subject. The DRE considers his or her findings of the foregoing and then concludes (a) whether the subject is behaviorally impaired, (b) if the impairment is drug-related, and (c) the drug class or combination of classes likely to be causing the impairment. A toxicological analysis is then done which either confirms or rebuts the DRE's conclusion about the drug classification.

The DEC identifies seven drug classes [3]: (1) central nervous system (CNS) depressants, (2) CNS stimulants, (3) hallucinogens, (4) phencyclidine (PCP), (5) Narcotic analgesics, (6) inhalants, and (7) cannabis. It then identifies physiological characteristics or indicia the medical profession routinely associates with the ingestion of each class of drugs. For example, horizontal gaze nystagmus is usually found with depressants, PCP, and inhalants, but not with stimulants, hallucinogens, analgesics and cannabis. Pupil size is usually dilated with stimulants, hallucinogens and possibly cannabis, but is usually normal for depressants, PCP, and inhalants, and constricted with analgesics. Blood pressure is usually down with depressants and analgesics, but is usually elevated with stimulants, hallucinogens, PCP, and inhalants (although it can be also be down with inhalants, depending on which one is inhaled). Pupils' reaction to light is usually slowed for depressants, stimulants, and inhalants, but normal

with other classes. People on depressants, hallucinogens, and inhalants are generally disoriented, uncoordinated, confused, and often slurred in their speech, while those on stimulants are euphoric, excited, talkative, restless, and have an increased alertness. These are but a few of the indicators which the DRE looks for.

It is acknowledged by everyone that none of these indicators is dispositive by itself. It is further acknowledged that for various reasons a specific indicator may not be present for a class. This can be caused by a lot of reasons, not the least of which is the ever increasing popularity of the multiple use of drugs and classes of drugs. The effects of one class may overpower or mask the effects of another. When alcohol is combined with other drugs, its distinct and readily recognizable manifestations often mask the presence of other drugs, making them indiscernible by the examiner.

The detection effort, and particularly the effort to identify which class of drugs may be responsible for the impairment, is further complicated by the fact that some drugs have a quicker onset of effect than others, some have a longer duration, and the toxicological evidence of some remain in the system longer than others, and sometimes long after the impairing effects have subsided.

Furthermore, unlike alcohol, where studies have been able to establish a direct measurement and correlation between the amount of alcohol in the system and the extent of impairment, with drugs there have been insufficient studies (and it may not be possible to do sufficient studies) to establish a comparable correlation between drug levels and impairment. Consequently, in cases where driving under the influence of drugs is charged, the officer and the court must look to observations of the subject's driving mannerisms and the results of the field sobriety tests which reflect the presence or absence of the ability to function where divided attention is required, and also reflect coordinative abilities.

3. It appears these were identified based upon the experience of the officers as being the most common or most likely classes of drugs expected to be used by drivers of automobiles. Experience

has shown that the popularity or use of these classes of drugs varies among metropolitan areas and even ebbs and flows in a given area.

Thus, apart from and beyond the question of admissibility of the officers testimony regarding the administration of the DRE tests, lies the question of whether the results of the test demonstrate impairment and not mere use.

To obtain certification, a DRE receives extensive training both in the classroom and in the field. It includes pretraining, special training in drug detection and in the taking of the pertinent vital signs. It involves three weeks (150 hours) of classroom instruction, followed by a written exam, and then testing in the field, while teamed with evaluators, of a certain number of evaluations. That is also followed by a multiple hour practical test. Ranger Bates testified that he was trained and certified in April 1996, that he has effected 300–400 traffic stops since certification, with 70–80 involving suspicion of being under the influence of alcohol or drugs, and that 40–50 of those were ultimately arrested. At the time the trial began, he had been employed by the National Park Service since June 1994. Prior to that he was employed as a deputy sheriff for Riverside County Sheriff's Department, in California.

### DISCUSSION OF ISSUES AND APPLICATION OF LAW AND FACT

#### I. IS DRE TESTIMONY CONTROLLED BY DAUBERT?

■ While these issues have been raised by invoking *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995) (hereafter referred to jointly as *Daubert* and designated separately as *Daubert* and *Daubert II* ), the Court must make the initial determination of whether *Daubert* controls. Defendant feels he is placed in the dichotomy of having to argue on one hand that the DRE is scientific or involves scientific principles, to justify his basis for objecting on the basis of *Daubert,* and on the other hand of arguing that it is not real science at all because failure to follow scientific method makes it invalid and

unverifiable. While the Court recognizes the difficulty, it submits that such a difficulty arises in the examination of any question of scientific admissibility.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court declared that the "general acceptance" test established by *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) had been replaced by the Federal Rules of Evidence, making specific reference to Rule 702.[4] In the place of the *Frye* test, which required general acceptance in the relevant scientific community, the Court, in *Daubert,* fashioned a two-prong test under Rule 702: "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. That is what the Supreme Court declared. In actuality, what it did was hold that expert testimony could not be excluded simply because it failed the *Frye* test. The courts must consider all the factors enumerated in Rule 702.

■ All experts are not scientific experts. Some experts rely on training and experience. Rule 702 covers both. *Daubert* does not. "*Daubert* was clearly confined to the evaluation of *scientific* expert testimony." *Thomas v. Newton International Enterprises,* 42 F.3d 1266, 1270 n. 3 (9th Cir.1994). As the Supreme Court stated, "Rule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here." *Daubert,* 509 U.S. at 589 n. 8, 113 S.Ct. at 2795 n. 8. As explained in *Daubert II,* the court must first determine whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science." 43 F.3d at 1315 (citing 509 U.S. at 590, 593, 113 S.Ct. at 2795, 2797). "The first inquiry. then, under *Daubert* is whether the proposed testimony of [the witness] was on a 'scientific *subject.*' "

4. Rule 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*United States v. Rincon,* 28 F.3d 921, 924 (9th Cir.1994).

■ Within the context of the foregoing limitation, the Supreme Court proceeded to list factors which the Court should consider in making the determination of admissibility of the proffered expert's testimony. Those factors for determining whether expert *scientific* testimony is admissible under Rule 702 are:

[1] whether the theory or technique employed by the expert is generally accepted in the scientific community; [2] whether it's been subjected to peer review and publication; [3] whether it has been tested; and [4] whether the known or potential rate of error is acceptable.

*Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97. The Ninth Circuit, "read these factors as illustrative rather than exhaustive; similarly, we do not deem each of them to be equally applicable (or applicable at all) in every case." *Daubert II,* 43 F.3d at 1317; *see also, United States v. Sherwood,* 98 F.3d 402, 408 (9th Cir.1996). The *Frye* "general acceptance" test is now just one of a number of considerations.

■ Neither the Court, nor the parties hereto, have been able to identify a federal court decision applying the *Daubert* case to the DRE. Certainly it does not appear that the DRE has been addressed by the federal courts in this District or Circuit (Ninth). The DRE has been addressed in a number of state courts. Those courts have most often permitted the testimony. However, most of those courts' analyses have been pursuant to the *Frye* test. Does the Supreme Court's holding, that the courts cannot exclude testimony solely on the grounds that it does not satisfy *Frye,* mean that if the testimony does satisfy *Frye* it is acceptable? The answer to that question is not clear, although there appears to be a trend toward more liberal admission.

The only state case brought to the Court's attention which addresses the DRE with reference to *Daubert* is the *Klawitter* case cited above. The Minnesota Supreme Court, in that case, noted, by footnote, the *Daubert* case but held that the DRE testimony meets its own test, the *Frye/Mack* standard and ruled it admissible. It noted, again in a footnote, as follows:

The state urges abandonment of the *Frye* standard in favor of the standard articulated in *Daubert v. Merrell Dow,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Because we affirm the determination that the *Frye* standard has been met here, we do not address the effect of the *Daubert* decision on the *Frye* rule in Minnesota.

*Klawitter,* 518 N.W.2d at 585 n. 3. Hence we are left without a DRE-*Daubert* analysis by any other courts.

Accordingly, the Court here must determine whether the proposed testimony is scientific or, rather, whether it is technical, or other specialized knowledge. In the traditional sense, one expects a scientific expert to testify about scientific theory or opinion which is linked in some fashion to the scientific method. Specialized knowledge, while it may result in conclusions or opinions drawn from observations and experience with scientific facts, deals more with the technical application, rather than the theoretical application of facts. An example sometimes used is the questions, "How does a bumblebee fly?" versus "Does a bumblebee always take off into the wind?" The answer to the first question comes from scientific knowledge or theory extracted from empirical testing and conclusions; the answer to the second is technical knowledge which comes from observation and conclusions. This is true even though the technical knowledge is impacted by or may even use information that is scientifically based, i.e., a bumblebee flies.

In this case the testimony of the DRE is based upon observations and tabulations of the results of those observations. He or she is not propounding a scientific principle or theory in testifying about the performance of the various steps of the evaluation and what the findings or observations were. It is arguable, however, that the opinion reached at the conclusion, that the subject is under the influence of and impaired by a certain class of drugs, purports to be a scientific-based opinion. For purposes of analysis of this issue, it is necessary to consider to what use the opinion or conclusion may be put. If the opinion or conclusion is proffered as expert

testimony, going to and dispositive of the ultimate issue, that is one use. If it is merely used to find probable cause for the DRE to arrest the subject and require a toxicological exam, that is another use. This Court finds that the DRE can testify to the probabilities, based upon his or her observations and clinical findings, but cannot testify, by way of scientific opinion, that the conclusion is an established fact by any reasonable scientific standard. In other words, the otherwise qualified DRE cannot testify as to scientific knowledge, but can as to "specialized knowledge which will assist the trier of fact to understand the evidence." FRE 702.

■ While blood pressure or the dilation of pupils has a scientific basis, the DRE is not attempting to testify about those scientific principles. Defendant argues that the entire testing protocol and resultant conclusions are, or take on the trappings of, scientific knowledge. However, the fact that multiple observations are used in concert, to reach a conclusion, does not necessarily elevate the result from the technical to the scientific. The pertinent components of the DRE protocol have long been established and used in the medical community as part of physical examinations (e.g., blood pressure and heart rate, observations of the eyes, nose, and mouth). Other components are identical to those used by police officers in evaluations for alcohol impairment (e.g., HGN and FSTs). *See, State of Minnesota v. Klawitter,* 518 N.W.2d 577 (1994). Whether and how the various components of the protocol are impacted by various classes of drugs are sufficiently established to permit the DRE to draw conclusions and reach opinions based upon observations. The validity of those conclusions or accuracy of the observations is certainly subject to cross-examination or other methods of impeachment, but any errors in that regard do not make the underlying steps of the DRE protocol junk science, or scientific at all.

■ There are numerous generally recognized indicators of alcoholic intoxication or impairment. A law enforcement officer may generally testify to observations, for example, that the subject was weaving down the road; that when the officer approached the subject he could smell a strong and distinct odor of an alcoholic beverage coming from the subject's person and vehicle; that the subject failed the routine field sobriety tests and was uncoordinated and unable to stand without holding on to something; that the subject's speech was slurred and incoherent; that open beer containers were observed; and the subject admitted to drinking a certain number of beers prior to the stop. The officer is permitted to conclude alcohol impairment or intoxication and require a breathalyzer examination and/or the providing of a urine sample for the purposes of verifying the officer's conclusion. The officer is permitted to determine that there is probable cause to believe that the subject has violated the law and effect an arrest. All of the manifestations observed by the officer can be traced, ultimately to some scientific principle of physiology. That does not make the officer's testimony scientific. It is, however, observed and given based upon the officer's specialized experience and training that permits the officer to recognize indicators of intoxication. The officer's testimony would be admissible without the necessity of a *Daubert* analysis. Even the gaze nystagmus test, though it may arguably have its limitations, is generally recognized as one of the indicators which can be considered in concert with the others.

The difference here exists only because the indicators are different. With the exception of marijuana, there will not likely be any strong smells, nor empty beer cans. In fact, alcohol is ruled out, otherwise the officer would arrest on that basis. It is easier to prove.

In the case of intoxication or impairment by drugs, many of the indicators are different. There can still be manifestations of driving behavior and field sobriety test results with drug impairment. But the lack of readily recognized indicators for drug impairment prompted efforts to identify and isolate indicators which, by a process of elimination, would permit the officer to reach a reasonable conclusion that the impairment was drug-caused and possibly permit the officer, by this same process of elimination, to be able to determine what class of drugs was involved. To accomplish the foregoing, it was necessary for the officer to receive addi-

tional extensive training in the indicators presented by the various classes of drugs. The search took the LAPD to an examination of medical, psychological, and toxicological treatises and caused them to enlist the assistance of health care professionals. The research enabled them to classify drugs with similar manifestations and to identify certain observable characteristics and also clinical characteristics common to that class. Some of the classes shared one or more characteristics, but none of the classes shared all the characteristics identified. The DRE is primarily the observable application of those classification differences.

Thus, when the DRE finds a subject who otherwise demonstrates no evidence of alcoholic intoxication, but whose driving suggests impairment and, upon examination observes that the subject is restless, has body tremors, excited, euphoric talkative, has exaggerated reflexes, anxious, has redness to nasal areas, a runny nose, insomnia, increased alertness, irritable, dilated pupils, increased blood pressure, increased respiration and pulse rate, there is reason to believe the subject has ingested and is influenced by central nervous system stimulants (cocaine, amphetamine or methamphetamine). On the other hand, if the symptoms are uncoordination, disorientation, sluggishness, thick and slurred speech, gait ataxia, drowsiness, a drunk-like behavior, no elevation of blood pressure or heart rate, and early onset of nystagmus, there is reason to believe the subject has ingested and is influenced by central nervous system depressants (barbiturates, tranquilizers, methaqualone).

Accordingly, this Court finds that DRE testimony is governed by Rule 702, but not by *Daubert*, on the basis that the DRE's testimony is not "scientific" in nature, but based upon observation, training and experience.

The foregoing notwithstanding, although this Court finds that *Daubert* does not control the determination of admissibility of the DRE evidence, it is instructive as a guide in the Court's overall gatekeeping role over the admission of evidence. In fact, this Court holds that even if the DRE program is found to be "scientific expert testimony" it meets the criteria of *Daubert* in all but possibly one factor. More will be said of this below.

## II. IS A RANGER CAPABLE OF BEING TRAINED TO CONDUCT THE NECESSARY TESTS?

All National Park Service Rangers are trained and certified as Emergency Medical Technicians (EMTs). That background, particularly with the additional training received by DREs, certainly qualifies them to conduct accurate examinations of the eyes, nose, heart rate, blood pressure and similar elements of physical examinations. Variations in ability are found among all persons, even doctors and nurses. The fact that errors may be made in the finding of blood pressure, pulse rate, or other tests and observations, or that incorrect conclusions could be drawn from the testing and observations deal with the lack of perfection in all human beings, not the invalidity of the tests themselves. "There are no certainties, even in science." *509 U.S. at 590, 113 S.Ct. at 2795.* And, the Court is cautioned not to confuse the law-finding role with the fact-finding role by forgetting that vigorous cross-examination and the presentation of contrary evidence are the more traditional and better methods of attacking shaky but admissible evidence. *United States v. Chischilly*, 30 F.3d 1144 (9th Cir.1994).

## III. DOES TALKING TO, AND POSSIBLY OBTAINING ADMISSIONS FROM, THE SUBJECT INVALIDATE THE VERACITY OF THE TESTS?

Some of the medical and scientific testimony produced by Defendant argues that the validity and veracity of the protocol are compromised because the arresting officer and/or the DRE asks questions of the subject. Admissions of drug use, according to the arguments, bias the DRE's findings and conclusions. This criticism goes to the weakness (and to some, the total invalidity) of the scientific method of the protocol. It is argued the studies of the program should be conducted blindly, without there being any hint from the subject as to whether drugs had been ingested. This, it is claimed, accounts for the high success rate of the DRE's in correctly identifying classes of drugs. This argument ignores the fact that the iden-

tification of the class of drugs is a bonus, not required by the law. The statute, or regulation, merely requires a finding that the person is under the influence of "a drug or drugs." (36 C.F.R. § 4.23(a)(1)). It does require the specific identity of *the* drug. Accordingly, this argument is not a factor in this issue. The argument also reveals the difference between the scientific method for detecting diseases, for example, and the method for detecting (transient) physical conditions. Furthermore, it defies the centuries old practice of physicians to take a history of patients in connection with a physical examination.

One of the purposes of physicians, and an equally valid purpose of the DRE, is to eliminate other potential causes for physical manifestations. Almost all physical conditions can have a multitude of causes. For example, many things can cause high blood pressure. The same is true for low blood pressure, or elevated pulse rate. Where two classes of drugs have some similarity in manifestations, (for example, CNS depressants and narcotic analgesics) admissions of use of one or the other should not be ignored by the DRE or the Court. The DRE protocol is obviously designed as a formalized process of elimination of potential causes of the physical manifestations seen by the DRE.

It will generally be obvious that a driver of a vehicle is not comatose. Injuries may or may not be obvious. However, whether the subject is suffering from disease or other physical condition, or is on medication, which can cause the manifestations observed by the DRE, may only be determined (at least in this setting) by asking the subject. It is not likely that a subject will claim use of drugs when that is not the case. He or she is more likely to deny their use. If use is acknowledged, against the subject's interest, the likelihood of accuracy is quite high.

## IV. CRITICISMS OF TEST GROUP PROFILES.

■ The Defendant, or more accurately some of his experts, criticizes the validity of some of the studies conducted to determine the accuracy of the DRE protocol. Those with no indications of impairment or drug ingestion are eliminated from the study group, they contend, thereby creating an ab-

normally high incidence of probability of finding drug impairment. Sometimes this is the result of the fact that officers only keep records on those individuals stopped because of suspicion of drug or alcohol impairment. The police do not have information on the many drivers never stopped, nor upon those stopped momentarily and released because no indications of drug or alcohol impairment are observed. This factor, it is argued, raises the possibility that pure luck could account for as much accuracy as the DRE program. The criticism disregards two important factors. First, the constitution does not permit law enforcement officers to subject citizens to examination, interrogation, toxicological or other tests, without some reasonable suspicion that a violation of the law has occurred or is occurring. Second, the initial decision to stop and the subsequent decision to investigate (and test) further is based upon important criteria of the protocol itself. To remove that aspect of the program would not provide an accurate test of the program itself. It would require the validity of the program to be judged by only limited criteria rather than the evaluation of the totality of the program. Since none of the steps of the protocol are able to establish, conclusively, the presence of drug impairment, the fewer the evaluator is able to use, diminishes the accuracy of the program. Accordingly, while the Court welcomes additional information and urges the continuation of additional studies to improve the effort to ensure traffic safety, it declines to disregard the studies conducted because no one has been able to establish the actual percentage of drug use, by classes, either among the general population or in a given metropolitan area of the general population.

## V. HAS THE DAUBERT CRITERIA BEEN SUBSTANTIALLY MET?

### A. Has it been Generally Accepted in the Scientific Community?

■ Certainly the underlying tests of vital signs, blood pressure, heart rate, pupil reaction, are well accepted in the medical community. The underlying tests and examinations used by the evaluator are acceptable, verifiable indicators of a person's physical

condition, although individually they do not establish the cause or causes of possible impairment. No one questions the physical characteristics, or changes in physical characteristics measured thereby. For example: (1) Blood pressure tests and the methods of testing are well established. (2) Pulse rate tests and methods of testing are well established. (3) Dilation and contraction of pupils, both as to size and speed of reaction, are well-accepted tests. (4) Even gaze nystagmus is accepted as a valid medical test, although some object to its application both here and in alcohol consumption detection. Horizontal gaze nystagmus is generally accepted by a majority of the courts as well as relevant medical practitioners as an accurate indication of whether alcohol is in the system. It is not generally accepted as a means to establish the level of the blood-alcohol content. Most courts still require toxicological tests for that. However, the presence or absence of gaze nystagmus in connection with the use of the drugs in question, is generally accepted. The Government provided excerpts from numerous medical publications to verify items (1)–(4), including *The Merck Manual of Diagnosis and Therapy* (Robert Kerkow, M.D., ed., Merck Research Laboratories 16th ed.1992); *Handbook of Emergency Toxicology* (Sidney Kaye, M.Sc., Ph.D., Charles Thomas 4th ed.1980); *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association 3d ed.1987); *Nursing '93 Drug Handbook* (Springhouse Publishing 1993); to name but a paltry few. Even with alcohol ingestion and impairment, the courts appear only to be divided over whether you can determine the percentage of blood content by it use, not whether it is an indicator of impairment. (5) There are several initial breath analyzer tests which are acceptable and, in this instance, is only important for the purpose of establishing the absence of alcohol-based impairment. (6) Field sobriety tests, or divided attention tests, are simple motor skills tests which are generally accepted as the means to test coordination and the ability to attend to the multiple tasks necessary in driving. There is some controversy as to which ones are the best and how many to do, but they are used extensively in the area of alcohol-impairment detection, not for purposes of establishing the presence of alcohol, but to provide evidence of the presence and extent of impairment itself. (7) The general examination, for needle injection sites, for example, is well within the expertise and experience of the EMT and DRE trained officer. (8) There is some question of the ability of the DRE to determine with appropriate accuracy whether the subject is experiencing muscle rigidity or flaccidity in a true medical context. However, where the condition is only a possible indicator and merely one among many, this Court is of the opinion that the DRE should be free to observe if there seems to be extreme rigidity or flaccidity and take that into consideration. The accuracy of the DRE's observations can be challenged in cross-examination. (9) The DRE is obviously trained in appropriate questioning techniques and the nature and extent of a person's legal rights relating thereto, to trust him or her with questions about the activities of the subject and incorporate the responses in the evaluation. (10) The DRE protocol requires the evaluator to integrate all this information and form a conclusion based upon them. The training of all officers requires them to evaluate facts and circumstances and draw reasonable inferences. The DRE receives special training and gathers experience in drawing specific conclusions about impairment and the identification of potential classes of drugs as the cause of the impairment. He or she should be permitted to testify if the required showing is made that the required training and experience exist. The weaknesses in the DRE's ability to observe or evaluate is a subject of cross-examination.

### B. Subject to Peer Review and Publication

Defendant complains that the reports and writings on this subject have not been submitted to the medical profession as a whole, but to only limited segments of that profession and then not in any national forum. However, the scientific community here is a limited one. It consists primarily of behavioral psychologists, highway safety experts, criminalists and medical doctors concerned with the recognition of alcohol and drug intoxication. Dr. Marcelline Burns, a research psychologist, is the founder of the Southern

California Research Institute which studies the effects of alcohol and drugs on behavior and performance. She conducted the tests for the National Highway Traffic Safety Administration to establish the battery of tests used in the protocol.

Dr. Burns and others have prepared numerous reports and papers for presentations before various organizations, including the American Association for Automotive Medicine, the International Conference on Alcohol, Drugs and Traffic Safety, The University of California, Los Angeles, the American Journal of Optometry & Physiological Optics, the Journal of Optometric Association, and the American Academy of Forensic Sciences.

Publication does not require articles in all medical journals, or even leading medical journals publishing articles of general interest. Presentation of papers at conferences and conventions subjects the content of those presentations and the opinions expressed therein, to the peer review of those interested in the physiological implications of drug and alcohol abuse. These writings began in the late 1970's and have continued to the present. The use of the protocol and its various elements has certainly not been kept a secret nor is there evidence that its proponents have attempted to avoid the limelight.

### C. Has it been Tested?

Several studies have been conducted, both of the effectiveness of the protocol and the DREs, and of the particular components of the protocol. The Johns Hopkins study and the field study by the LAPD, under the direction of the NHTSA, have already been mentioned. There have been subsequent studies as well although most of them utilized only parts of the protocol. Some have been less successful than others. There are those who question the veracity of the statistics generated. However, generally those most critical of the study methods are those who have not had personal exposure to the DRE training or the actual conducting of the DRE program. Most of those critical to the program object to questioning by the examiner, the ability of the DRE to conduct the examination, the fact that the study populations in field tests have already eliminated those not suspected of intoxication or impairment, or the fact that there has been no determination of the percentage of drug use, by class, of the total population.

The foregoing objections certainly may be raised in rebuttal, but they do not preclude the admissibility of the DRE's testimony based upon the claim that the protocol has not been tested.

### D. Has a Potential Rate of Error been Established?

First, it should be noted that neither side of the issue has taken a position as to what an acceptable rate of error is. Most of the studies involving the entire testing procedure reflects less than a 10 percent rate of false positives. That is, where the DRE expresses an opinion that a certain class of drug is present and it is not confirmed by the toxicological results. Even in some of those cases, however, there were drugs present, just not the particular drug identified. Furthermore, it is possible that a drug and its effects could have been present at the time of the physical examination, but not when the specimen was drawn. Additionally, some drugs will continue to metabolize in urine, or if the specimen is not kept cool.

While other errors are made, such as false negatives, i.e., there was a drug present but not detected, the errors enure to the benefit of the subject, as that person would be released and not charged. For the same reason that the Court would admit the testimony of an officer testifying about his observations and field sobriety tests of an alcohol intoxicated driver, even though the officer could be wrong, this Court finds the same justification for admitting the testimony of the DRE here for the same purposes. The potential rate of error is certainly sufficiently low to provide probable cause to require a toxicological examination. This Court finds that it is sufficiently within bounds to admit the evidence of the DRE's conclusion as probable cause and circumstantial evidence of the presence of and possible impairment by drugs.

The Court maintains some reservation about the potential rate of error which causes it to come short of permitting the DRE to testify, with the apparent authority of scientific expertise, that the presence of the partic-

ular class of drugs is an established fact. That is the ultimate decision the fact finder can and must make. And, the toxicological report provides more scientifically trustworthy evidence of that fact.

It bears repeating that the statute or regulation under which the Defendant is charged, does not require the drug, or even the class of drug, to be identified. The ultimate purpose of the DRE program is to train officers in the recognition of the symptoms and conditions present when drugs have been ingested.

Accordingly, based upon the exhibits submitted by the parties, this Court finds that the DRE program, with the possible exception of potential rate of error,[5] adequately meets even the requirements of *Daubert* for the purposes of admissibility of the testimony. Whether the testimony gives rise to the further finding of being impaired by or under the influence of drugs is quite another matter.

### E. Was the Protocol Developed Under the "Shadow of Litigation?"

The Ninth Circuit *Daubert* decision raises, and resolves, the issue of whether the proposed testimony grows out of "matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." 43 F.3d at 1317. The Ninth Circuit notes that since most experts testify for money, that factor should be considered. However, that fact alone does not necessarily destroy the scientific nature and validity of the testimony. It also notes that where the expert's findings are the result of research existing outside the controversy in litigation there is less likelihood of bias toward a particular conclusion. *Id.* This concern, however, really relates to weight, not admissibility, of the evidence, and the Ninth Circuit found that it was not to be a substantial consideration in those situations where the scientific efforts are closely connected to law enforcement. The Court, by footnote, stated as follows:

There are, of course, exceptions. Fingerprint analysis, voice recognition, DNA fingerprinting and a variety of other scientific endeavors closely tied to law enforcement may indeed have the courtroom as a principal theatre of operations. See, e.g., *United States v. Chischilly*, 30 F.3d 1144, 1153 (9th Cir.1994) (admitting expert testimony concerning a DNA match as proof the defendant committed sexual abuse and murder). As to such disciplines, the fact that the expert has developed an expertise principally for purpose of litigation will obviously not be a substantial consideration.

*Id.* In this case it is easy to cast a "shadow of litigation" over the development of the DRE protocol. However, the motivating force for the development of the program was highway safety and the identification of drug impaired drivers. Its use in court is only a secondary outgrowth of the primary purpose of the research and development.

Accordingly, this Court finds the research and development of the DRE program and protocol to have sufficient independence of this litigation as to have virtually no impact on the consideration of admissibility, and no substantial impact on the weight this Court gives the proposed testimony.

### DISCOVERY UNDER DAUBERT

 The parties have argued at length over the question of whether the discovery needs and rights for a *Daubert* hearing in a criminal case are the same as for a civil case. In the latter case, there are extensive rules (Fed.R.Civ.P. 26, for example) regarding discovery and requirements for disclosure of the identity of experts to be used, together with evidence of their opinions and the bases therefor. In criminal matters, discovery is conducted under much more strict limitations (*see,* Fed.R.Crim.P. 16). The Court is inclined toward the assumption that criminal *Daubert* matters would not be subject to the broad provisions of the Civil Rules, but that some consideration must be given to provide a just opportunity to fairly raise the issue in the criminal context.

---

**5.** It should be remembered that *Daubert II* found the factors illustrative rather than exhaustive and

not all equally applicable (or applicable at all) in each case. 43 F.3d at 1317.

However, in this case the issue is moot. Extensive documentation was exchanged, including the actual testimony of experts' opinions on behalf of both parties. Accordingly, the Court will deny the discovery motion here, as moot, and decline to postulate or render judgment about what the status of the law should be.

### DECISION AND ORDER

Based upon the foregoing, it is the DECISION and ORDER of this Court that, upon the appropriate foundation being laid, the Drug Recognition Evaluation protocol conducted by Ranger Bates, together with his conclusions drawn therefrom, shall be admitted into evidence to the extent that the DRE can testify to the probabilities, based upon his or her observations and clinical findings, but cannot testify, by way of scientific opinion, that the conclusion is an established fact by any reasonable scientific standard. In other words, the otherwise qualified DRE cannot testify as to scientific knowledge, but can as to specialized knowledge which will assist the trier of fact to understand the evidence.

The Court adds that it should be obvious that the mere fact that such opinion testimony is admitted does not necessarily mean that such testimony by itself will be sufficient to support a guilty verdict.