86 P.3d 1002

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Nicole N. COFFEE, Defendant–Appellant.**

No. 23068.

Intermediate Court of Appeals of Hawai'i.

Feb. 12, 2004.

Certiorari Denied March 25, 2004.

Chris C. China, for defendant-appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

WATANABE, Acting C.J., LIM and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

**I.**

On November 25, 1998, Defendant–Appellant Nicole N. Coffee (Coffee) was charged by complaint in the Circuit Court of the First Circuit (circuit court) with the following:

Count I, Driving Under the Influence of Drugs (DUI–Drug), in violation of Hawaii

Revised Statutes (HRS) § 291–7 (1993);[1] and

Count II, Noncompliance with Speed Limit, in violation of HRS § 291C–102(a) (1993).[2]

The circuit court remanded the case to the District Court of the First Circuit, Honolulu Division (district court) for a bench trial. On November 18, 1999, Coffee was found guilty of the DUI–Drug charge.[3] Coffee's motion to stay her sentence pending appeal was granted by the district court. Judgment was filed on October 9, 2003.

On appeal, Coffee contends: (1) the district court erred in denying her motion to suppress evidence without holding a hearing or issuing findings of fact and conclusions of law; (2) the district court erred in taking judicial notice of Police Officer Sherman Dowkin's (Officer Dowkin) expertise as a Drug Recognition Expert and the 12–Step Drug Recognition Evaluation Matrix (matrix test) to recognize drug impairment; (3) the evidence was legally insufficient to support a DUI–Drug conviction; (4) Coffee received ineffective assistance of counsel; and (5) the district court erred in denying Coffee a jury trial.

## II.

Coffee was arrested on July 15, 1998. At her arraignment on November 20, 1998, Coffee requested a trial by jury for the DUI–Drug charge, and the case was transferred to circuit court. On December 23, 1998, the State filed a Motion to Remand Case to the District Court of the First Circuit for Trial on the Merits (Motion to Remand). On January 28, 1999, the circuit court[4] granted the Motion to Remand, finding that because the offense was a petty misdemeanor and not constitutionally "serious," Coffee was not entitled to a jury trial.

On December 22, 1998, Coffee filed a Motion to Suppress Evidence (Motion to Suppress) based on unreasonable search and seizure and a Motion in Limine to Preclude Testimony of Drug Recognition Expert (Motion in Limine) in which Coffee asked the court to preclude Officer Dowkin from testifying as an expert witness at trial. Prior to the start of trial on August 2, 1999, the district court denied the Motion to Suppress, finding that because the motion had no affidavit or exhibits attached to it and stated merely factual allegations, there was not "sufficient basis to raise the issue."

The district court also denied the Motion in Limine and took "judicial notice by stipulation of the parties" of its prior decision in *State v. Danny Wong,* where the court had qualified Officer Dowkin as an expert and the matrix test as a sufficient test to determine drug impairment. During trial, the district court reiterated that it was taking judicial notice of its prior decision in *Wong.*

At trial, Officer Dowkin testified that on July 15, 1998, at about 6:45 p.m., he was on his police motorcycle stopped directly behind Coffee's vehicle at a red light on Pua Inia Street in Kaneohe. Coffee turned onto Kamehameha Highway and rapidly accelerated. Officer Dowkin followed her car. While maintaining a distance of approximately seven car lengths, Officer Dowkin clocked Coffee's vehicle for approximately two-tenth's of a mile at a speed of 56 to 58 miles per hour (MPH) in a 35 MPH zone. Officer Dowkin testified that Coffee "was weaving after the vehicle got to speed." The license plate on Coffee's vehicle read "TOKE IT," and,

---

1. Hawaii Revised Statutes (HRS) § 291–7 (1993) provides in relevant part:

   **§ 291–7 Driving under the influence of drugs.** (a) A person commits the offense of driving under the influence of drugs if the person operates or assumes actual physical control of the operation of any vehicle while under the influence of any drug which impairs such person's ability to operate the vehicle in a careful and prudent manner. The term "drug" as used in this section shall mean any controlled substance as defined and enumerated on schedules I through IV of chapter 329.

2. HRS § 291C–102 (1993) provides in relevant part:

   **§ 291C–102 Noncompliance with speed limit prohibited.** (a) No person shall drive a vehicle at a speed greater than a maximum speed limit and no person shall drive a motor vehicle at a speed less than a minimum speed limit established by county ordinance.

3. The Honorable George Y. Kimura presided.

4. The Honorable Sandra A. Simms presided.

through Officer Dowkin's training and experience, he knew the term was related to the use of marijuana. Officer Dowkin stopped Coffee's vehicle and asked Coffee to produce her driver's license, no-fault insurance card, and vehicle registration; it took Coffee about five minutes to obtain these documents. Coffee's eyes were watery and glassy with a marked reddening of the conjunctiva (which appeared as blood vessels puffing out). Coffee appeared nervous and had slurred speech and a burnt marijuana smell coming from her face.

Officer Dowkin testified that he asked Coffee if she would consent to a field sobriety test (FST) and she agreed. Prior to administering the FST, Officer Dowkin asked Coffee preliminary questions about whether she had any possible physical defects or speech impediments, whether she was taking medication or seeing a doctor or dentist, and if she had epilepsy, diabetes, or contact lenses. Coffee informed him she was taking medications for sinusitis, migraine headaches, and backaches.

The FST consisted of the horizontal gaze nystagmus (HGN), walk-and-turn, and one-leg stand tests. Coffee showed no signs of impairment under the HGN test. During the walk-and-turn test, Coffee lost her balance one time, had spaces between her steps, missed some heel-to-toe steps, raised her arms six inches from her sides throughout the test, and stepped off the line once. During the one-leg stand test, Coffee swayed in a one-to-three-inch circular manner, raised her arms, had severe leg tremors, and had to be reminded three times of the instructions.

Due to Coffee's failing the walk-and-turn and one-leg stand tests, Officer Dowkin felt Coffee was impaired to the point that she was unable to safely operate her vehicle. Coffee voluntarily took a preliminary alcohol screening test, which indicated that there was no presence of alcohol. Officer Dowkin testified he placed Coffee under arrest for DUI–Drug based on the totality of the circumstances, including "the driving, her physical appearance, her performance of the standardized field sobriety test, the, in my opinion, absence of alcoholic beverages." At the Kaneohe police station, Officer Dowkin

administered the breath-alcohol test to Coffee; she registered .000 on the test. He informed Coffee of the reasons he arrested her, asked her if she wanted to participate in the matrix test, and informed her of the possible consequences.

After Coffee consented to the matrix test, Officer Dowkin asked her protocol questions pertaining to her hours of sleep, food consumption, illnesses, medication, etc., that day. Officer Dowkin's initial check of Coffee's pulse indicated that her pulse was outside the normal range. He checked Coffee's pupil sizes to see if they were equal, whether her eyes were tracking normally, and if there was an initial angle of onset—all the results were normal. Officer Dowkin checked Coffee's eyes for HGN by looking for a lack of smooth pursuit, maximum deviation and angle onset; he found no HGN. He did not find vertical nystagmus. Coffee did display a lack of convergence during the eye test.

Next, Officer Dowkin conducted the divided attention tests to evaluate if Coffee was able to operate a vehicle in a safe manner. Officer Dowkin was taught that marijuana can significantly impair an individual's ability to divide his/her attention between tasks. Officer Dowkin testified that "[d]riving an automobile requires that a person divide their attention amongst many tasks while driving, such as operating the gas, brake, maintaining awareness of the surroundings, monitoring their speed, and basically controlling their vehicle."

Officer Dowkin administered to Coffee the Romberg balance test, which checks a person's internal body clock. During this test, Officer Dowkin noted that Coffee swayed to maintain balance and experienced severe eyelid and body tremors. During the walk-and-turn test, she lost her balance, missed heel-to-toe steps, stepped off the line, raised her arms, and took too many steps. Throughout the one-leg stand test, Coffee swayed while balancing, used her arms to balance, hopped, put her foot down, and experienced body and leg tremors. While taking the fingertip-to-nose test, Coffee missed her nose on all six attempts. A circular body sway and severe eyelid and body tremors were noted.

After administering these tests, Officer Dowkin took Coffee's blood pressure, temperature, and a second pulse reading, which were all above the normal range. Officer Dowkin testified that he had been taught that an elevated pulse and blood pressure typically indicate the possible use of cannabis.

Officer Dowkin took Coffee into a dark room to test her pupils, which were abnormal under darkness and indirect light tests and which presented rebound dilation under direct light conditions (a condition synonymous with the cannabis category). Officer Dowkin checked Coffee's nasal passages, which were clear. While checking inside her mouth, Officer Dowkin noted that the rear portion of her tongue had a slight green tint, which can be associated with the use of marijuana. Officer Dowkin noted her muscle tone was near normal and there were no injection sites. A third check of Coffee's pulse indicated that it was on the higher end of the normal range.

Based on the totality of his evaluation, Officer Dowkin was of the opinion that Coffee was under the influence of cannabis and could not safely operate her vehicle. Officer Dowkin read Coffee the implied consent form and her *Miranda* rights, at which time she indicated that she would answer his questions. Coffee stated that the last time she had smoked marijuana was a week prior, but she had been in the presence of others smoking marijuana that day. Coffee signed a form consenting to take a urine test, and a female officer took the sample.

The urine sample was sent to Clinical Laboratories of Hawai'i and placed in a locked refrigerator. Michael Lau (Lau), a medical lab technologist, testified that on July 16, 1998 he evaluated Coffee's urine specimen. Lau checked to make sure the bag was intact, chain of custody had been properly filled in, the container was properly sealed and not tampered with, and matched the container to the chain of custody. He prepared a photometric multi-analyzer to perform a general screening on the urine, which showed a reaction to the cannabinol reagent. Lau verified the finding by screening a second sample and then placed the remaining specimen in a refrigerator for a second testing.

Cynthia Morrison (Morrison), a toxicologist, testified that she performed a chemical extraction to remove the drugs from Coffee's specimen. Running the extract through a mass spectrometer, Morrison found that it was positive for 209 nanograms per millimeter of tetrahydrocannabinol (THC), the chemical name for marijuana. After verifying the data, Morrison froze the urine specimen and placed it in a locked freezer for certification by Dr. Clifford Wong.

Dr. Clifford Wong (Dr. Wong), the Toxicology Director and a qualified expert in toxicology, testified that he validated the results of Coffee's sample by ensuring that the chain of custody had been intact and the controls had been properly run. Dr. Wong testified that the cutoff level for confirmation of the presence of THC is 15 nanograms per millimeter; a reading below the cutoff level would be considered a negative. Dr. Wong confirmed that Coffee's level was 209 nanograms per millimeter. He further testified that THC shows up in the blood stream ten to fifteen minutes after smoking and peaks in the urine three hours after that. The amount of time THC would remain in the urine depended on the history of the person and the person's body makeup. THC would remain in the urine of a naïve user for three days, while for a regular user it may remain up to three weeks. Because he was unfamiliar with Coffee's history of marijuana usage, Dr. Wong could not say if Coffee had smoked marijuana up to a week prior to her giving the urine sample.

Coffee testified that Police Officer Yamane transported her to the Kaneohe police station. Officer Yamane seemed apologetic and gave her the impression that he thought she was sober. Coffee testified that one of the officers at the Kaneohe station advised her to use the bathroom to clean out her system before giving the actual urine sample. Except for Officer Yamane, Coffee was unable to recall the names of the other officers. Based on her testimony, Coffee made a motion to continue the trial so she could subpoena Officer Yamane to testify as to her condition at the time of her arrest. The district

court granted her motion because the officers' statements, whether or not they were made, interplayed into the issue of credibility.

The transcript of the November 18, 1999 proceedings, when trial was resumed, was not provided to this court due to a malfunction of the court reporter's equipment; no reconstruction of what occurred during the November 18 proceedings appears in the record. The record does reflect that the only witness called on November 18, 1999 was Officer Dowkin.

### III.

■ Hawai'i Rules of Penal Procedure Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Staley*, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (internal quotation marks and citation omitted).

■ The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks and citation omitted).

This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes. *Id.* at 42, 979 P.2d at 1068 (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

### IV.

■ Coffee contends the district court erred when it took judicial notice of Officer Dowkin's qualifications as a Drug Recognition Expert[5] (DRE) and of the matrix test[6] as a sufficient test to ascertain drug impairment. Specifically, Coffee contends that the court's taking judicial notice of the district court judge's prior decision in *State v. Danny Wong* was improper under Hawaii Rules of Evidence (HRE) Rules 201,[7] 702,[8]

---

5. Use of the term "expert" has been noted by other courts as presumptuous and somewhat invasive into the court's province of determining just who are experts. Currently, the term "expert" is being replaced with the term "examiner." *See United States v. Everett*, 972 F.Supp. 1313, 1316 n. 2 (D.Nev.1997).

6. The Drug Recognition Evaluation Program was developed by the Los Angeles Police Department in the 1970's and early 1980's to train officers to recognize the behavioral and physiological symptoms associated with the major classes of psychoactive drugs. The program consists of a 12–step standardized evaluation conducted by a Drug Recognition Expert (DRE) and a toxicological analysis of a biological specimen to confirm or rebut the DRE's conclusions. *Everett*, 972 F.Supp. at 1316–17. However, the detection effort and the identification of which class of drugs are causing the impairment are further complicated because some drugs have a quicker onset of effect than others, some have longer duration, and some remain in the body system long after the impairing effects have subsided. *Id.* at 1317.

7. Hawaii Rules of Evidence (HRE) Rule 201 provides in relevant part:

**Rule 201 Judicial notice of adjudicative facts.** (a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary. A court may take judicial notice, whether requested or not.

(d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.

8. HRE Rule 702 provides:

**Rule 702 Testimony by experts.** If scientific, technical, or other specialized knowledge

702.1,[9] 703,[10] and 705.[11]

During Coffee's trial, as the State attempted to qualify Officer Dowkin as an expert in drug recognition, the district court intervened and the following exchange occurred between the court and the deputy prosecuting attorney:

**THE COURT:** It's my understanding that *State vs. Danny Wong* was taken judicial notice of. In that case, I believe, the Court qualified Mr. Dowkin as an [sic] DRE expert, as an expert, so why are we going through this?

**[Deputy Prosecuting Attorney (DPA)]:** Your Honor, well, if the defense is willing to—I guess, the defense, if they would be willing to stipulate to these exhibits. They were unwilling to do so. Ms. [C]offee was not a defendant in this case. If the defense is willing to stipulate to these exhibits and to the testimony and exhibits of *State vs. Wong*, then I could save the time of going through this.

**THE COURT:** Well didn't I take judicial notice of *State vs. Danny Wong?*

**[DPA]:** Yes, your Honor, for purposes of the motion in limine. If the Court—

will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

9.  HRE Rule 702.1 provides:
    **Rule 702.1   Cross-examination of experts.** (a) General. A witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be cross-examined as to (1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion.
    (b) Texts and treatises. If a witness testifying as an expert testifies in the form of an opinion, the witness may be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication only if:
    (1) The witness referred to, considered, or relied upon such publication in arriving at or forming the witness' opinion, or

**THE COURT:** It's my understanding, and correct me if I'm wrong, that in my decision, pending appeal of course, said witness stipulations inter alia, provide the following to be recited, in seriatim: Number one, the *Wong* case which is designated as the test case for the purpose of hearing movant's and movee's motions. Number two, in all other cases, including the cases captioned above, where movant, which is the Public Defender's Office, has filed motions, this Court may take judicial notice and incorporate into the record all said cases, all the motions, memoranda, transcripts, et cetera, in that case. This shall include all cases whether original jurisdiction is in Honolulu, Kaneohe, Ewa, Wahiawa, Waialua or Waianae Divisions, correct?

**[DPA]:** Yes, your Honor——

**THE COURT:** And this decision said: number one, the DRE program 12–step matrix was a valid test to ascertaining drug impairment; number two, that case further ruled Officer Dowkin was a qualified expert, is that correct?

**[DPA]:** Yes, your Honor.

(2) Such publication qualifies for admission into evidence under rule 803(b)(18).

10.  HRE Rule 703 provides:

    **Rule 703   Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

11.  HRE Rule 705 provides:

    **Rule 705   Disclosure of facts or data underlying expert opinion.** The expert may testify in terms of opinion or inference and give the expert's reasons therefor without disclosing the underlying facts or data if the underlying facts or data have been disclosed in discovery proceedings. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

**THE COURT:** Why do you have to go through all this?

[DPA]: Your Honor, based upon the Court's colloquy, I would ask that Officer Dowkin be qualified as an expert witness in this case.

Following this discussion, the State's exhibits establishing Officer Dowkin's completion of his preliminary and classroom training, the Drug Recognition Evaluation Program, and his instructor training were admitted without objection by Coffee's counsel. Coffee's counsel did object to the admission of Officer Dowkin's drug recognition expert card because it was not the original of the card; the exhibit was received over Coffee's counsel's objection.

We note that the record of the referenced test case, *State v. Danny Wong*,[12] is not before this court. The record in this case contains nothing more than references to the *Wong* case, and our review must be limited to the record before us. HRS § 641–2 (1993).

Judicial notice of an adjudicative fact is permissible if the fact is "not subject to reasonable dispute that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." HRE Rule 201.

In its answering brief, the State contends that the taking of judicial notice by the district court was proper because "[a]fter 'an extensive hearing' held in *Wong*, . . . Judge Kimura qualified Officer Dowkin as an [sic] DRE and ruled that 'the DRE program 12 step matrix was a valid test to ascertaining drug impairment[.]'" In support of this contention, the State relies on *State v. Akana*, 68 Haw. 164, 706 P.2d 1300 (1985), in which the Hawai'i Supreme Court noted that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records." *Id.* at 165, 706 P.2d at 1302. The State also relies on *State v. Kotis*, 91 Hawai'i 319, 984 P.2d 78 (1999), for the proposition that the "taking of judicial notice of

the records and files of a case may or may not be proper, depending upon the type of record at issue and the purpose for which it is considered." *Id.* at 343, 984 P.2d at 102.

The Hawai'i Supreme Court has "validated the practice of taking judicial notice of a court's own records in an interrelated proceeding where the parties are the same." *Akana*, 68 Haw. at 165, 706 P.2d at 1303. In the instant case, the district court took judicial notice of its prior determination that Officer Dowkin was qualified as a DRE and the matrix test was a valid test to ascertain drug impairment. Coffee was not a party in the *Wong* case. The district court acknowledged that not only was Coffee not a party in the *Wong* case, but also that Coffee's attorney was unfamiliar with and not privy to the court's prior ruling in *Wong*.

A judge's personal familiarity with his prior decision in a different case does not warrant the taking of judicial notice of that prior decision solely in the interest of judicial efficiency. The district court judge's taking such judicial notice denied Coffee a fair hearing because Coffee was not privy to the evidence offered in *Wong* nor afforded the opportunity to test, explain, or refute such evidence. *Pua v. Hilo Tribune–Herald, Ltd.*, 31 Haw. 65, 69–70 (1929). A defendant must be fully appraised of the evidence submitted and be allowed to cross-examine witnesses, inspect the documents, and offer her own rebuttal or explanatory evidence. *Id.* at 70.

The State contends that the taking of judicial notice was proper because in *Wong* the Office of the Public Defender and the Office of the Prosecuting Attorney had stipulated that, after *Wong*, all other defendants in DUI-drug cases handled by the aforementioned offices would be precluded from relitigating the same issues that had been ruled upon in *Wong*. However, as the record in *Wong* is not before this court, we cannot evaluate the reliability of the matrix test and Officer Dowkin's expertise to determine if they are "so well-established that their relia-

12. The appeal in *State v. Wong*, S.Ct. No. 22505 was dismissed by stipulation of the parties on November 16, 1999.

200

bility may be presumed." *State v. Ito*, 90 Hawai'i 225, 236, 978 P.2d 191, 202 (1999).

The federal district court in *United States v. Everett, supra,* noted in its evaluation of the DRE program and the matrix test that,

unlike alcohol, where studies have been able to establish a direct measurement and correlation between the amount of alcohol in the system and the extent of impairment, with drugs there have been insufficient studies (and it may not be possible to do sufficient studies) to establish a comparable correlation between drug levels and impairment.

972 F.Supp. at 1317. The court held that the DRE "cannot testify, by way of scientific opinion, that the conclusion is an established fact by any reasonable scientific standard. In other words, the otherwise qualified DRE cannot testify as to scientific knowledge, but can as to 'specialized knowledge which will assist the trier of fact to understand the evidence.'" *Id.* at 1320 (quoting Federal Rules of Evidence Rule 702). The validity of the DRE's and matrix test's conclusions or the accuracy of the DRE's observations must be subject to impeachment, whether by cross-examination or other methods. *Id.* Clearly these were not the type of facts that were generally known within the territorial jurisdiction of the district court or capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned, as required for the taking of judicial notice. The district court plainly erred in taking judicial notice of these facts.

## V.

Coffee's contention that there was insufficient evidence to sustain her DUI–Drug conviction is without merit. Viewing the evidence in the light most favorable to the State, we conclude that there was credible evidence of sufficient quality and probative value to enable a person of reasonable caution to conclude that the evidence supported Coffee's conviction. *State v. Batson*, 73 Haw. 236, 248–49, 831 P.2d 924, 931 (1992).

Coffee's contention that she was entitled to a jury trial is also without merit. *State v. Sullivan*, 97 Hawai'i 259, 36 P.3d 803 (2001).

Coffee's other points on appeal need not be addressed by this court given the disposition of her appeal.

## VI.

Because the district court committed plain error in taking judicial notice of the district court judge's prior ruling in *State v. Danny Wong* that the 12–step Drug Recognition Evaluation Matrix was a valid test to ascertain drug impairment and that Officer Dowkin was a Drug Recognition Expert, we vacate the October 9, 2003 Judgment of the district court and remand this case for further proceedings.