991 P.2d 1151 (2000)
140 Wash.2d 1
STATE of Washington, Appellant,
v.
Michael BAITY and Edward Arnestad, Respondents.
No. 66876-1.
Supreme Court of Washington, En Banc.
Argued November 16, 1999.
Decided February 3, 2000.
*1153 Nielsen, Broman & Associates, David Bruce Koch, Seattle, for Amicus Curiae on behalf of Washington Association of Criminal Defense Attorneys.
John Ladenburg, Pierce County Prosecutor, Michael Sommerfeld, Barbara Corey-Boulet, Deputies Pierce County Prosecutor, Tacoma, for Appellant State.
John Cross, Port Orchard, for Respondents.
*1152 TALMADGE, J.
We are asked in this case to determine if a drug recognition protocol, used by trained drug recognition officers to determine if a suspect's driving is impaired by a drug other than alcohol, meets the requirements of Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (1923), for novel scientific evidence. We hold that the protocol meets the mandate of Frye. An officer may testify concerning such drug impairment, subject to the limitations set forth in this opinion, upon meeting the requirements of ER 702 and 703 for the admission of expert opinion testimony. We reverse the suppression orders of the Pierce County District Court and remand the cases for further proceedings consistent with this opinion.

ISSUE
Is a drug recognition program novel scientific evidence generally accepted in the scientific community, thus satisfying the Frye test for admissibility?

FACTS
The Drug Evaluation and Classification Program (DECP) was developed by the Los Angeles Police Department (LAPD) in the 1970's. The program's purpose is to train officers to recognize the behavior and physiological conditions associated with seven categories of psychoactive drugs, to determine whether a suspect is driving while impaired by a drug other than alcohol. In most jurisdictions, officers trained in this program are *1154 known as Drug Recognition Experts (DREs).[1]
In 1984, the National Highway Traffic Safety Administration (NHTSA) and the National Institute on Drug Abuse sponsored a controlled laboratory evaluation of the DRE program, conducted by researchers at the Johns Hopkins University. Clerk's Papers at 1477 (U.S. Dep't of Transp. Nat'l Highway Traffic Safety Admin., Drug Evaluation and Classification Program, Briefing Paper (July 1992)). Subsequently, the NHTSA developed a standardized curriculum for training police officers as DREs and, utilizing this training, initiated DECP's in states meeting the site selection criteria. As the DRE program continued to expand, NHTSA recognized the need for an organization to assume oversight of the program on a national level. See Thomas E. Page, MA, The Drug Recognition Expert (DRE) Response to the Drug Impaired Driver: An Overview of the DRE Program, Officer, and Procedures (Jan.1995) . In 1989, the International Association of Chiefs of Police (IACP) assumed national oversight of the program and became the certifying and regulating body for the DRE program. Id.
To be certified as a DRE, an officer must complete a three-phase program of instruction. First, the officer must attend a 16-hour "preschool," which involves an overview of the DRE program, and instruction on the seven drug categories and basic drug terminology. Second, the officer must complete a 56-hour DRE school program. This program consists of 30 modules of instruction, including an overview of the development and validation of the drug evaluation process, and sessions on each drug category. In addition to classroom instruction, the program requires practical field training. Additionally, the officer must pass a written examination before beginning the next phase of training. Finally, the officer begins certification training. Certification requires the officer participate in a minimum of 12 complete examinations under the supervision of a trained DRE instructor. Of those 12 evaluations, the officer must identify an individual under the influence of at least 3 of the 7 drug categories. The officer is required to obtain a minimum 75 percent toxicological corroboration rate. The officer must then pass another written examination and a separate skills demonstration examination performed in front of two DRE instructors before he or she becomes certified as a DRE. Finally, the officer must maintain an up-to-date resume or curriculum vitae.
Additionally, a DRE must be recertified every two years. During that time period, the DRE is required to conduct four hands-on evaluations and to attend eight hours of in-service training.
The Washington State DRE program began in March 1996, although it did not become operational until July 1997. The Washington State DRE program complies with the IACP standards, and officers in this state use the same 12-step protocol adhered to nationally. Currently, the program is used in King, Pierce, Thurston, Yakima, and Spokane Counties.
DREs are trained to determine whether a driver is under the influence of drugs, and then to determine the type of drug causing the observable impairment. To accomplish this, DREs classify drugs into seven categories: (1) central nervous system (CNS) depressants, (2) inhalants, (3) phencyclidine (PCP), (4) cannabis, (5) CNS stimulants, (6) hallucinogens, and (7) narcotic analgesics. The training is based on the premise that each drug within a category produces particular signs and symptoms. The effect of any given drug can vary from drug to drug, primarily in terms of intensity and duration of action, and is dependent on many factors, including the amount ingested, the user's tolerance to the drug, and the drug's purity. In theory, the DRE protocol enables the *1155 DRE to rule in (or out) many medical conditions, such as illness or injury, contributing to the impairment.
To determine whether a driver is under the influence of a specific category of drugs other than alcohol, DREs use a 12-step procedure based on a variety of observable signs and symptoms that are known to be reliable indicators of drug impairment. All DREs, regardless of agency, use the same procedures, in the same order, on all drivers. In theory, a DRE will not reach a final decision until the entire evaluation is complete.
The 12-steps of the protocol are:
(1) breath (or blood) alcohol concentration;
(2) interview of the arresting officer; (3) preliminary examination; (4) eye examinations; (5) divided attention tests; (6) vital signs examination; (7) darkroom examination of pupil size; (8) examination of muscle tone; (9) examination of injection sites; (10) statements, interrogation; (11) opinion; (12) toxicology analysis.
A DRE's opinion is based not on one element of the test, but on the totality of the evaluation. When in doubt, the DRE must find the driver is not under the influence.
The present case involves the use of the DRE protocol in assessing the condition of two drivers. On November 29, 1997, Edward Arnestad was arrested after running into the rear end of a car stopped at a traffic light. At the scene, Arnestad evidenced slurred speech, watery eyes, and the odor of intoxicants. He denied any alcohol use, but admitted use of drugs. He failed field sobriety tests. The State subsequently charged Arnestad with one count of driving under the influence of intoxicating liquor and or drugs (DUI), in violation of RCW 46.61.502(1)(b) and (c).[2]
On January 29, 1998, Michael Baity was arrested and cited for DUI and driving while license suspended in the third degree after an officer observed him in his car speeding and weaving lane to lane. Baity smelled of alcohol. He admitted to marijuana use. The responding DRE observed Baity's tongue was green in color and his eyes were somewhat dilated, exhibited rebound dilation, and did not demonstrate nystagmus. Alcohol and marijuana were found in his car. The State charged Baity with one count of DUI, in violation of RCW 46.61.502(1)(b) and (c), and one count of driving while license suspended in the third degree, in violation of RCW 46.20.342(1)(c).
In a pretrial motion in Baity's case, the State sought to qualify the DREs as experts and to obtain a ruling on the admissibility of DRE evidence with respect to the defendant's drug impairment and the evaluation process used to determine that impairment. Specifically, the State sought to admit testimony that Baity's impairment was consistent with the symptoms associated with one of seven categories of drugs. Additionally, the State moved to admit testimony regarding the use of the horizontal gaze nystagmus (HGN) test,[3] both for the detection of alcohol and for the detection of drugs. Baity moved to suppress all DRE evidence, including the HGN test, on the basis that the DRE program and protocol constitute novel scientific evidence subject to the Frye test for admissibility.
Since identical evidentiary issues were simultaneously raised before each of the five Pierce County District Court Number One judges,[4] the cases were consolidated for purposes of a Frye hearing to avoid unnecessary expense and time. The court employed the unusual procedure of sitting "en banc," although *1156 each individual judge was required to exercise his or her independent discretion with respect to a decision on the admissibility of the evidence.[5] At the conclusion of a four-day Frye hearing, the court indicated it would take the matter under advisement and issue an opinion at a later date.
On April 21, 1998, Baity and Arnestad appeared separately for trial before Judge Culpepper.[6] Judge Culpepper ruled in both cases that the DRE program, which formed the basis of the officer's opinion regarding impairment, did not meet the Frye standard for admissibility. He then excluded testimony as to the defendants' alleged drug impairment.
On May 19, 1998, the Pierce County District Court judges issued their opinion titled, "Opinion Regarding Admissibility of HGN and DRE." In that opinion, they denied the defendants' motions to suppress the field sobriety tests (FSTs) as to their alcohol impairment, holding those tests are "reasonably understandable to the ordinary person" and therefore not subject to Frye. Clerk's Papers at 56. The court also noted some features of the DRE protocol were either not of a scientific nature or were scientific, but not novel.[7] Although the court ruled HGN meets Frye as to alcohol, it held "the expansion of that proof to drugs has not been established. For this reason, the HGN although perhaps useful to explain the absence of alcohol, will not be allowed to provide proof of the presence of any drug." Clerk's Papers at 68-69. Moreover, the court indicated the chart used by DREs to categorize drugs and their associated symptoms failed to meet Frye. The overall ruling of the court was that the DRE program and protocol did not meet the Frye test for admissibility if the officer were offering an opinion about the presence of a specific drug or category of drug. Consequently, the DRE's testimony was limited to his or her observations and opinion that the defendant had ingested a drug, but the DRE could not give an opinion as to a specific drug or family of drugs. For reasons that are not entirely clear, the State believed the effect of this ruling was to terminate its cases. The district court dismissed the charges against Baity and Arnestad. Subsequently, the Statement. petitioned us for direct review under RAP 4.3, which we granted.[8]

ANALYSIS
We review a trial court's decision to admit or exclude novel scientific evidence under Frye de novo. See State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993). Such review involves a mixed question of law and fact. Id.; State v. Copeland, 130 Wash.2d 244, 255, 922 P.2d 1304 (1996). We review the trial court's decision to admit or reject expert opinion testimony under ER 702 and 703 under an abuse of discretion standard. See State v. Ortiz, 119 Wash.2d 294, 308, 831 P.2d 1060 (1992).
Washington has adopted the Frye test for determining if evidence based on novel scientific procedures is admissible. Copeland, 130 Wash.2d at 255, 922 P.2d 1304; see also State v. Woo, 84 Wash.2d 472, 527 *1157 P.2d 271 (1974). The test states: "evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community." State v. Martin, 101 Wash.2d 713, 719, 684 P.2d 651 (1984).[9] We determine if evidence meets Frye from a number of sources. See Cauthron, 120 Wash.2d at 888, 846 P.2d 502 (examining the record, available literature, and the cases of other jurisdictions in determining a particular type of deoxyribonucleic acid (DNA) testing was admissible). However, evidence that does not involve new methods of proof or new scientific principles is not subject to the Frye test. See Ortiz, 119 Wash.2d at 310-11, 831 P.2d 1060. Once the Frye standard is met, the evidence must still satisfy the two-part inquiry under ER 702whether the witness qualifies as an expert, and whether the testimony would be helpful to the trier of fact. See Cauthron, 120 Wash.2d at 889-90, 846 P.2d 502.
In applying the foregoing analysis, Washington courts have held certain evidence was not subject to Frye because it was not novel scientific evidence. Compare Cauthron, 120 Wash.2d at 899, 846 P.2d 502 (DNA typing is subject to Frye because of the complexity of the DNA process) and Woo, 84 Wash.2d at 473-75, 527 P.2d 271 (explicitly adopting Frye for determining the admissibility of polygraph examinations) with State v. Noltie, 57 Wash.App. 21, 29-30, 786 P.2d 332 (1990) (holding Frye does not apply to colposcopic evidence because it is in general use in the medical community and is no more "novel" than binoculars or a weak microscope, even though its use in child abuse cases was relatively recent), aff'd, 116 Wash.2d 831, 809 P.2d 190 (1991), and State v. Hettich, 70 Wash.App. 586, 591 n. 3, 854 P.2d 1112 (1993) (doubting the Frye standard would apply because the witness' testimony was not based on novel scientific experimental procedures, "`but rather upon his own practical experience and acquired knowledge.'" (quoting Ortiz, 119 Wash.2d at 311, 831 P.2d 1060)), review denied, 123 Wash.2d 1002, 868 P.2d 871 (1994).
In the present case, the district court properly analyzed the admissibility of DRE evidence under Frye, despite the fact no reported Washington case has previously evaluated such evidence. We agree the evidence does have a scientific aspect, which tends to cast a scientific aura about the DRE's testimony requiring its assessment under Frye. Thus, we now turn to whether DRE evidence is generally accepted in the relevant scientific communities.
In considering the individual features of DRE evidence, we concur with the district court that the 12 steps of the protocol are not always scientific in nature. Certainly, the steps involving an interview of the arresting officer or consideration of the defendant's own statements are not. The steps involving preliminary examination of the suspect or the search for injection sites are largely observational. Moreover, other steps such as blood alcohol content measurement or toxicology analysis are indeed scientific, but hardly novel in nature. In contrast, the principal step of the protocol that qualifies as novel scientific evidence is the assertion that persons who have ingested certain drugs evidence nystagmus.
A number of jurisdictions have held that "the scientific reliability of the HGN test *1158 has been established without the need for expert testimony in a particular case." City of Fargo v. McLaughlin, 512 N.W.2d 700, 705 (N.D.1994) (citing numerous jurisdictions that have accepted HGN testing without the need for expert testimony). Still other jurisdictions have held HGN testing is not scientific because it simply involves an officer's objective observations of the subject's physical characteristics. See, e.g., Whitson v. State, 314 Ark. 458, 863 S.W.2d 794 (1993); State v. Bresson, 51 Ohio St.3d 123, 129, 554 N.E.2d 1330 (1990) ("HGN test cannot be compared to other scientific tests, such as polygraph examination, since no special equipment is required."). Accordingly, these jurisdictions have held that HGN testing is no different than any other field sobriety test. See McLaughlin, 512 N.W.2d at 706 ("These cases equate HGN test results to a physical manifestation, like the staggering gait of a drunk."). Finally, several jurisdictions require HGN testing to satisfy the Frye general acceptance standard before HGN results are admitted. See People v. Leahy, 8 Cal.4th 587, 882 P.2d 321, 34 Cal.Rptr.2d 663 (1994). Accord State v. Superior Court, 149 Ariz. 269, 718 P.2d 171, 177, 60 A.L.R.4th 1103 (1986).
After careful review of these alternative positions, we agree the underlying scientific basis for HGN testingan intoxicated person will exhibit nystagmusis "undisputed, even by those cases and authorities holding the test inadmissible without scientific proof in each case." See Superior Court, 718 P.2d at 177 (holding that a person will show a higher degree of nystagmus at higher levels of intoxication). Even the district court agreed with this proposition, stating:
The evidence presented in this hearing establish [sic] that the following propositions have gained general acceptance in the relevant scientific community: (1) the HGN occurs in conjunction with alcohol consumption, (2) that the onset of HGN and its distinction are strongly correlated to breath alcohol levels, ... (4) law enforcement officers can be trained to observe these phenomena and administer the test[.]
Opinion Regarding Admissibility of HGN and DRE at 11. Just because HGN testing has not always been used to determine drug impairment does not render the test inadmissible. See Noltie, 57 Wash.App. at 29-30, 786 P.2d 332 (holding Frye does not apply to colposcopic evidence because it is in general use in the medical community, even though its use in child abuse cases is relatively recent).
Furthermore, application of the HGN test is not entirely novel. In fact, the NHTSA recommends the HGN test as one of several field sobriety tests to help officers determine whether a driver is intoxicated. See State v. Witte, 251 Kan. 313, 836 P.2d 1110, 1112 (1992). Officers have been utilizing this test in DUI arrests for decades. The test is performed in the same manner, regardless of whether the officer is testing for alcohol impairment or drug impairment. The test merely requires the DRE to observe the driver's eyes to detect involuntary jerking. As the Supreme Court in North Dakota succinctly noted: [the DRE], "based upon his training in these principles, observes the objective physical manifestations of intoxication, and no expert interpretation is required." McLaughlin, 512 N.W.2d at 706 (citing State v. Murphy, 451 N.W.2d 154, 157 (Iowa 1990)).
Here, the record from the district court Frye hearing indicates the tests for nystagmus are generally accepted in the relevant scientific communities as a means of indicating ingestion of certain drugs. For example, the State's experts, Sergeant Thomas Page, Dr. Marcelline Burns,[10] and Dr. Barry Logan, each testified the HGN tests were so accepted. Even the defense expert, Dr. Craig Smith, conceded as much.
Notwithstanding its general acceptance in the relevant scientific communities, the defense and the amicus argue many factors make HGN testing unreliable, including *1159 the possibility of false positives and other possible physiological causes. Br. of Amicus Curiae at 11-12. However, none of those factors undercut the basis of the testthat intoxicated people exhibit nystagmus. Furthermore, the factors noted by the defense would apply equally to the other field sobriety tests that are routinely used in DUI arrests. All of those factors can be shown through cross-examination, and they therefore go to the weight of the evidence, rather than its admissibility. See United States v. Everett, 972 F.Supp. 1313, 1320 (D.Nev.1997) (noting the validity of the DRE's conclusions or accuracy of his or her observations is subject to cross-examination or other methods of impeachment); see also Ortiz, 119 Wash.2d at 311, 831 P.2d 1060 (noting it was for the jury to decide what weight should be attached to the witness' testimony).
Although HGN testing is scientific in nature it is generally accepted in the relevant scientific communities. Thus, we hold the forensic application of HGN to drug intoxication in the DRE context satisfies Frye.
Turning next to the 12-step test itself and the chart used by DREs with respect to behavioral characteristics associated with the seven classes of drugs, we must analyze whether the DRE protocol, as a whole, comports with Frye. The courts across the country that have addressed the admissibility of DRE evidence have approached the protocol from varying analytical standpoints. They have generally admitted DRE evidence.[11] For example, in Everett, 972 F.Supp. 1313, the federal district court in Nevada asked whether DRE testimony was controlled by Daubert.[12]Id. at 1321 (noting the analysis of those courts most often permitting the testimony has been pursuant to the Frye test). In rejecting the Daubert challenge to the admissibility of DRE evidence, the court held "DRE testimony is governed by Rule 702, but not by Daubert, on the basis that the DRE's testimony is not `scientific' in nature, but based upon observation, training and experience." Id. Nonetheless, the court recognized that the opinion reached (that the driver was under the influence of a certain class of drug) "purports to be a scientific-based opinion." Id. at 1319. However, the court distinguished between the different uses of the opinion:
If the opinion or conclusion is proffered as expert testimony, going to and dispositive of the ultimate issue, that is one use. If it is merely used to find probable cause for the DRE to arrest the subject and require a toxicological exam, that is another use. This Court finds that the DRE can testify to the probabilities, based upon his or her observations and clinical findings, but cannot testify by way of scientific opinion, that the conclusion is an established fact by any reasonable scientific standard.
Id. at 1319-20. Consequently, the court concluded:
[f]or the same reason that the Court would admit the testimony of an officer testifying about his observations ... of an alcohol intoxicated driver, even though the officer could be wrong, this Court finds the same justification for admitting the testimony of the DRE here for the same purposes.
Id. at 1324. Thus, upon the appropriate foundation being laid, the court would allow evidence of the DRE protocol to be admitted. Id. at 1326.
In Williams v. State, 710 So.2d 24 (Fla. App.), review denied, 725 So.2d 1111 (Fla. 1998), the Florida district court of appeal divided the 12-step protocol into two separate portions, distinguishing between the protocol's general portion and its eye examination subsets, the HGN, Vertical Gaze Nystagmus (VGN), and Lack of Convergence (LOC) Tests. See id. at 28. With respect to the general portion of the protocol, the court *1160 held the Frye standard did not apply because "the general portion of the DRE protocol consists of nothing more than objective observations and simple tests which are easily performed and commonly understood[,]" id. at 29; thus, the general portion of the protocol is not scientific. Id. On further analysis, the court held the DRE protocol subsets, including HGN, VGN, and LOC, were "scientific" within the meaning of Frye, but that Frye did not apply because the "use of the HGN test to establish the presence of alcohol ha[d] already gained general acceptance in the scientific community." Id. at 32.
Like the Williams court, the Minnesota Supreme Court also divided the DRE protocol into two separate portions. See State v. Klawitter, 518 N.W.2d 577 (Minn.1994). The court began its analysis of the protocol by stating:
the protocol followed by [the trooper] is not itself a scientific technique but rather a list of the things a prudent, trained and experienced officer should consider before formulating or expressing an opinion whether the subject is under the influence of some controlled substance.
Klawitter, 518 N.W.2d at 584. The court further stated:
of the twelve steps of the protocol, few of them seem to call for any particular medical or scientific training or skill on the part of the officer.... Only the tests for horizontal and vertical nystagmus and for convergence are out of the ordinary, but they can hardly be characterized as emerging scientific techniques. Nystagmus and convergence have long been known and the tests contemplated by the protocol have been in common medical use without change for many years.... Nevertheless, this step ... is "scientific" in the sense we use the term when deciding whether to scrutinize evidence to ascertain if it has gained sufficient acceptance in scientific circles.
Id. Based on this analysis, the court then conducted a separate Frye test to determine whether the nystagmus portion of the protocol was admissible. See id. at 584-85. The court ultimately affirmed the lower court's decision that the HGN test satisfied Frye. See id. at 585 (concluding "the protocol, in the main, dresses in scientific garb that which is not particularly scientific.").
DRE officers employ a drug chart to assess the behavioral characteristics of persons who have ingested certain families of drugs. This chart classifies drugs by categories, noting common behavioral attributes for persons ingesting such drugs. Baity and Arnestad contest its admissibility. Like HGN testing, we believe the chart is generally accepted in the scientific community as well. Dr. Logan so testified in the hearing below. Moreover, a variety of scientific texts ranging from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders to the Physician's Desk Reference classify drugs by categories involving the characteristics of drugs. A DRE officer may employ this chart in testimony.
The relevant scientific communities for the assessment of DRE evidence include pharmocologists, optometrists, and forensic specialists. For these disciplines, DRE evidence is generally accepted. For example, the NHTSA and the ICAP, as well as the American Bar Association and the American Optometric Association have approved the DRE protocol. Tests of the ability of DREs to discern whether a suspect has ingested drugs or a particular family of drugs have been undertaken by the LAPD, Johns Hopkins University, and the states of Arizona and Washington. The test results confirm the reliability of the DRE protocol in a forensic setting.
In summary, after analyzing the DRE protocol and the approach of other courts to its admissibility, we hold the DRE protocol and the chart used to classify the behavioral patterns associated with seven categories of drugs have scientific elements meriting evaluation under Frye. We find the protocol to be accepted in the relevant scientific communities. We emphasize, however, that our opinion today is confined to situations where all 12-steps of the protocol have been undertaken. Moreover, an officer may not testify in a fashion that casts an aura of scientific certainty to the testimony. The officer also may not predict the specific level of drugs present in a suspect. The DRE officer, properly qualified, may express an *1161 opinion that a suspect's behavior and physical attributes are or are not consistent with the behavioral and physical signs associated with certain categories of drugs.
Finally, the DRE evidence must also satisfy the predicate two-part inquiry under ER 702whether the witness qualifies as an expert, and whether the testimony would be helpful to the trier of factbefore the evidence is admissible. See Cauthron, 120 Wash.2d at 889-90, 846 P.2d 502. A proper foundation for DRE testimony would include a description of the DRE's training, education, and experience in administering the test, together with a showing that the test was properly administered. See State ex rel. Hamilton v. City Court, 165 Ariz. 514, 799 P.2d 855 (1990); Superior Court, 718 P.2d at 181. Practical experience may be sufficient to qualify a witness as an expert. See Ortiz, 119 Wash.2d at 310, 831 P.2d 1060.
In this case, however, the trial court did not evaluate whether the DRE's testimony satisfied ER 702 and 703 because it held the DRE protocol did not satisfy the threshold test of Frye. Thus, we remand this consolidated case to the district court to allow that court to evaluate the admissibility of the DRE's testimony under ER 702 and 703 in Baity and Arnestad's individual cases.

CONCLUSION
DRE evidence is admissible under Frye because it is generally accepted in the relevant scientific communities. A properly qualified expert may use the 12-step protocol and the chart of categories of drugs to relate an opinion about the presence or absence of certain categories of drugs in a suspect's system. We reverse the Pierce County District Court decision refusing to admit DRE evidence and we remand these cases to that court for proceedings consistent with this opinion.
GUY, C.J., SMITH, JOHNSON, MADSEN, ALEXANDER, SANDERS, IRELAND, JJ., and COLEMAN, J.P.T., concur.
NOTES
[1] DRE is the term used by the LAPD and some other agencies in reference to those officers certified through the DECP. The International Association of Chiefs of Police "recognizes that the `E' in DRE may represent `expert', `examiner', `evaluator' or any equivalent term." Clerk's Papers at 1480. It is improper for a court, however, to refer to such an officer as an "expert" before the officer is so qualified under ER 702. In this opinion, we merely refer to such officers hereafter as DREs.
[2] RCW 46.61.502 states: "(1) A person is guilty of driving while under the influence of intoxicating liquor or any drug if the person drives a vehicle within this state: ... (b) While the person is under the influence of or affected by intoxicating liquor or any drug; or (c) While the person is under the combined influence of or affected by intoxicating liquor and any drug."
[3] Nystagmus is the involuntary oscillation of the eyeballs, which results from the body's attempt to maintain orientation and balance. HGN is the inability of the eyes to maintain visual fixation as they turn from side to side or move from center focus to the point of maximum deviation at the side. See State v. Cissne, 72 Wash.App. 677, 680, 865 P.2d 564 (citing Stedman's Medical Dictionary, 971 (5th ed.1982)), review denied, 124 Wash.2d 1006, 877 P.2d 1288 (1994).
[4] Those judges are: Judge Ronald Culpepper, Judge James Heller, Judge Judy Jasprica, Judge David Kenworthy, and Judge Jack Nevin.
[5] When asked if the court would be issuing one decision, the court responded

I would suggest there probably would be one opinion from which there would beI won't necessarily say dissenting opinion, but expectations taken particularly in the way, perhaps fact finding, and potentially could reach different conclusions. But each person, each judge is reaching their own decision regarding the case.
Report of Proceedings II at 7-8.
[6] Arnestad's case had not previously been formally consolidated with Baity's. The parties entered a written stipulation that incorporated the record from the Frye hearing in Baity's case into the record of Arnestad's case.
[7] Some of the twelve steps, such as interrogation, observation of nose and mouth, and search for needle marks, indeed are not scientific..... Other parts of the drug recognition protocol have previously been deemed admissible at a DUI trial, such as breath and blood tests, field sobriety tests and statements of defendants.... The other tests involving pupil reaction, pulse, temperature, and blood pressure results all involve some scientific component, but are not novel.

Opinion Regarding Admissibility of HGN and DRE at 17-18.
[8] The Commissioner's Ruling granting review notes that a number of courts of limited jurisdiction have come to conflicting results on the admissibility of DRE evidence and Frye.
[9] We have often distinguished between novel scientific evidence that meets Frye, because it is generally accepted in the relevant scientific community, and evidence that does not meet Frye. See, e.g., State v. Allery, 101 Wash.2d 591, 682 P.2d 312 (1984) (recognizing the battered woman syndrome); State v. Janes, 121 Wash.2d 220, 235, 850 P.2d 495, 22 A.L.R. 5th 921 (1993) ("Given the close relationship between the battered woman and battered child syndromes, the same reasons that justify admission of the former apply with equal force to the latter."). Cf. State v. Riker, 123 Wash.2d 351, 359, 869 P.2d 43 (1994) (admitting evidence of battered person syndrome in "classic" cases in which the batterer and the victim have developed a strong relationship (i.e., husband/wife relationship), but declining to extend the syndrome to cases involving a nonbattering, nonintimate relationship); see also State v. Black, 109 Wash.2d 336, 348, 745 P.2d 12 (1987) ("rape trauma syndrome" evidence inadmissible because the characteristic symptoms may follow any psychologically traumatic event and there is no "typical" response to rape); State v. Martin, 101 Wash.2d 713, 719, 684 P.2d 651 (1984) (hypnosis evidence inadmissible because, among other things, effective cross-examination is seriously impeded).
[10] Sergeant Page and Dr. Burns also testified as experts in State v. Klawitter, 518 N.W.2d 577 (Minn. 1994), and People v. Quinn, 153 Misc.2d 139, 580 N.Y.S.2d 818 (1991), rev'd, 158 Misc.2d 1015, 607 N.Y.S.2d 534 (1993). Additionally, Dr. Burns testified as an expert in State v. Superior Court, 149 Ariz. 269, 718 P.2d 171, 177, 60 A.L.R.4th 1103 (1986).
[11] Moreover, some states have taken legislative action with respect to the DRE program. For instance, Maryland and Maine have each codified use of the DRE program and have provided for the admission of DRE opinion testimony. See MD.CODE ANN., TRANSP. § 16-205.1 (1999 Supp); ME.REV.STAT. ANN. tit. 29-A §§ 2525, 2526 (West 1996).
[12] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), is the federal test for admissibility of scientific evidence. The distinctions between Frye and Daubert do not diminish the utility of the court's analysis in Everett.