NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JANICE ELAINE BRAGAW,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12854
Trial Court No. 3KN-16-00097 CR

O P I N I O N

No. 2692 — February 26, 2021

Appeal from the Superior Court, Third Judicial District, Kenai, Anna M. Moran, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for the Appellant. Michal Stryszak, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge HARBISON.

Janice Elaine Bragaw was convicted, following a jury trial, of felony driving under the influence.[1] On appeal, she argues that the trial court erred in admitting testimony about her performance on a drug recognition evaluation (DRE) without first requiring the State to establish the scientific validity of the DRE protocol. Bragaw also argues that the trial court erred in prohibiting a defense expert from critiquing the scientific reliability of certain aspects of the DRE that rely on medical or physiological knowledge as well as the reliability of the DRE protocol in general.

For the reasons explained here, we conclude that the DRE protocol is scientific evidence subject to the *Daubert/Coon* standard, and that the trial court therefore erred in admitting this evidence without first determining its scientific validity.[2] We also conclude that the trial court erred in excluding the proposed testimony from Bragaw's expert. Because these two errors were not harmless, we reverse Bragaw's conviction and remand for a new trial.

*Background facts and procedural history*

In January 2016, Alaska State Trooper Ryan Tennis stopped a vehicle driven by Bragaw for a cracked taillight and swerving within the lane of travel. Although Bragaw initially denied drinking, when Tennis contacted her, he noticed a mild odor of alcohol while speaking with her. Tennis also noted that many of Bragaw's answers to his questions were confused or non-responsive, and that she had hesitant and

---

[1]  AS 28.35.030(n). Bragaw also pleaded no contest to driving with a revoked license and two counts of violating conditions of release. Bragaw does not challenge these additional convictions on appeal.

[2]  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); *State v. Coon*, 974 P.2d 386, 393-94 (Alaska 1999) (adopting the *Daubert* standard for admissibility of scientific evidence in Alaska), *abrogated on other grounds by State v. Sharpe*, 435 P.3d 887, 899-900 (Alaska 2019).

slightly slurred speech. Bragaw told him that she took several prescribed medications, including Librium — a benzodiazepine whose side effects include drowsiness, reduced motor coordination, and memory impairment.

Based on these observations, Tennis asked Bragaw to submit to field sobriety tests. Although Bragaw passed the alphabet test, she failed the remaining field sobriety tests: the horizontal gaze nystagmus test, the walk-and-turn test, the one-leg-stand test, and the counting test. The trooper ultimately decided to end the walk-and-turn and one-leg-stand tests early out of concern that Bragaw "was almost falling over." After conducting these tests, Tennis asked Bragaw again whether she had consumed any alcohol. This time, Bragaw admitted to having a mixed drink several hours earlier.

The trooper arrested Bragaw for driving under the influence and transported her to the trooper post, where a breath test revealed a .032 percent breath alcohol content. Because Tennis suspected that Bragaw's level of impairment may have been related to her prescription medications as well as her alcohol consumption, he requested the assistance of another trooper, Trooper Matthew Wertanen, to perform a drug recognition evaluation (DRE) on Bragaw.[3] After performing the DRE, Wertanen concluded that Bragaw "show[ed] signs of consumption of [central nervous system] depressants and [central nervous system] stimulants." Bragaw subsequently consented to a blood test that confirmed the presence of Librium — a central nervous system depressant — but did not reveal any evidence of stimulants.

Because Bragaw had been convicted of driving under the influence twice within the preceding ten years, the State charged Bragaw with felony driving under the

---

[3] A drug recognition evaluation is a standardized, twelve-step protocol "designed to enable law enforcement to identify (1) whether a subject's ability to operate a vehicle is impaired and (2) which category of drugs has affected a subject." *State v. Aleman*, 194 P.3d 110, 112 (N.M. App. 2008).

influence.[4] Prior to trial, the State filed a notice identifying Wertanen as "both a fact and expert witness" who would testify not only about his personal observations of Bragaw, but also about the DRE protocol itself, including the protocol's accuracy, reliability, and "[w]idespread acceptance," as well as to his expert opinion regarding Bragaw's level of impairment.

In response, Bragaw filed a motion to exclude testimony about the DRE unless the State first complied with the requirements for admission of scientific evidence under *Daubert/Coon*, in particular, by showing that the testimony was based on scientifically valid reasoning or methodology that could properly be applied to the facts of Bragaw's case.[5] Bragaw's attorney conceded that Wertanen was entitled to testify to his personal observations. However, she argued that the DRE protocol is scientific evidence subject to the court's gatekeeping function and that both the DRE protocol and the opinion Wertanen formed based on the protocol were unreliable and, accordingly, inadmissible.

Analogizing Wertanen's proposed testimony to the administration of field sobriety tests, the trial court concluded that Wertanen's testimony was "not scientific, but rather is based on his observations that are qualified by his experience." Consequently, the court ruled that Wertanen's testimony about the DRE was not subject to the *Daubert/Coon* standard. Consistent with this ruling, the court allowed Wertanen to testify about the DRE protocol, but it instructed the parties to refer to Wertanen only as a DRE "evaluator," rather than an "expert," and it required the parties to refer to his conclusion that Bragaw was impaired by a controlled substance as a "suspicion" rather than an "opinion."

---

[4] AS 28.35.030(n).

[5] *See Daubert*, 509 U.S. at 592-93; *Coon*, 974 P.2d at 393-94.

At trial, Wertanen testified at length about his training and certification as a drug recognition evaluator, the twelve-step DRE protocol, Bragaw's performance on each of those steps, and his conclusion regarding Bragaw's consumption of controlled substances. Wertanen testified that although he had suspected Bragaw consumed both depressants and stimulants, a later blood test confirmed only the presence of a depressant — the Librium medication Bragaw had admitted taking.

After the State rested its case-in-chief, Bragaw called a medical expert, Dr. Norman Means, to testify about his criticisms of the physiological portions of the DRE protocol; his criticism of the reliability of the DRE protocol in general; his opinion that no conclusion of impairment could be drawn from the quantity of Librium found in Bragaw's blood; and the varying effects medications may have on individual patients. The court allowed Dr. Means to testify about these latter two subjects as well as on limited topics related to the DRE, such as what medical professionals consider a normal body temperature and pulse rate. But the court prohibited Dr. Means from providing his opinion criticizing the reliability of the DRE protocol because (according to the trial court) the validity of the DRE was "not an issue currently before the court."

*Overview of the DRE protocol*

In order to understand Bragaw's claim and our resolution of this case, it is necessary to lay out the origins and facets of the DRE protocol in some detail.

The DRE protocol originated in the 1970s as a means to assess drivers suspected of driving under the influence of a substance other than alcohol.[6] The DRE protocol has three major functions:

---

[6]   *See State v. Sampson*, 6 P.3d 543, 548 (Or. App. 2000) (recounting the history of the DRE protocol).

First, it attempts to determine the existence of impairment in a driver and to determine whether that impairment is caused by alcohol or drugs. Second, it asks whether the cause of the impairment is something other than alcohol or drugs, such as a medical condition. Third, if the impairment is caused by drugs, the DRE protocol purports to identify which drug, among seven broad categories, covered the impairment.[7]

Developed through the joint efforts of the Los Angeles Police Department and the Southern California Research Institute, the protocol "combined [field sobriety tests] with police drug training, medical information about the physiological and behavioral effects of controlled substances, and law enforcement information about police interaction with impaired drivers."[8]

In the decades that followed, officers from all fifty states have been certified as drug recognition evaluators by the International Association of Chiefs of Police — the organization responsible for providing national oversight of the DRE program — and specifically by the association's Drug Recognition Section, whose membership includes law enforcement officers as well as others who have a "professional interest" in the DRE program, including physicians, toxicologists, and prosecutors.[9] Other organizations have published numerous studies examining the accuracy of the DRE protocol, including controlled clinical studies and field validation studies.[10]

---

[7]   *Id.* (internal citation omitted).

[8]   *Id.*

[9]   Gregory T. Seiders, Comment, *Call in the Experts: The Drug Recognition Expert Protocol and Its Role in Effectively Prosecuting Drugged Drivers*, 26 Widener L.J. 229, 233-34 (2017).

[10]   *Id.* at 260-61; *State v. Baity*, 991 P.2d 1151, 1154 (Wash. 2000); *see also State v. Aleman*, 194 P.3d 110, 118 (N.M. App. 2008) (noting that the DRE has been "the subject of

(continued...)

Only an officer properly trained and certified in the administration of the DRE may conduct the evaluation.[11]  In general, to obtain certification, an officer must complete "classroom instruction and training on topics such as field sobriety tests, human physiology, and drug pharmacology," and achieve at least a seventy-five percent toxicological corroboration rate on a certification exam.[12]  Certification is valid for two years, and the officer must maintain a minimum accuracy rate and complete continuing education requirements in order to renew the certification.[13]

The DRE protocol, which is also known as the Drug Influence Evaluation, consists of twelve steps:  (1) a breath alcohol test to rule out alcohol as the source of the driver's impairment; (2) an interview with the arresting officer to ascertain the driver's behavior and any admissions made during or after the traffic stop; (3) a preliminary physical examination, which includes checking the driver's eyes, taking a pulse, and asking general health questions; (4) an examination of the driver's eyes for horizontal gaze nystagmus, vertical gaze nystagmus, and lack of convergence; (5) administration of four balance and divided attention tests; (6) a check of the driver's vital signs; (7) measurement of the driver's pupil size under different lighting conditions and a check of the driver's nose and mouth for signs of drug ingestion; (8) a check for rigid or flaccid muscle tone; (9) a physical inspection of the driver's body for possible injection sites; (10) focused questioning of the driver; (11) the evaluator's formal opinion as to whether

---

[10]  (...continued)
scrutiny of the scientific community"); *State v. Chitwood*, 879 N.W.2d 786, 797-99 (Wis. App. 2016) (summarizing numerous published studies and peer reviews that examined the validity of the DRE as a means of identifying drug impairment).

[11]  *Sampson*, 6 P.3d at 548.

[12]  Seiders, *supra* note 9, at 240-41.

[13]  *Id.*

the driver is under the influence of a certain category of drugs; and (12) blood or other toxicological testing to confirm the presence of a controlled substance.[14] The evaluator does not rely on any one observation to form an opinion but rather looks to the totality of the circumstances to determine whether the subject is impaired.[15]

A DRE evaluator is trained to identify impairment caused by seven different categories of drugs: central nervous system depressants, central nervous system stimulants, dissociative anesthetics, narcotic analgesics, inhalants, hallucinogens, and cannabis.[16] In order for the DRE results to be considered valid, the final step — the blood test — must confirm that the defendant ingested at least one category of drugs identified by the officer. However, the blood test need not corroborate the officer's identification in its entirety. For example, if the officer believes that the driver is impaired by only one category of drugs, the test results must confirm that same category, but if the test results also reveal one additional category of drugs, the DRE is still considered valid. Similarly, if the officer identifies two categories of drugs and the blood test confirms only one of those categories — as occurred in Bragaw's case — the DRE is also still considered valid. In other words, if the officer correctly identifies one category of drug — and does not *incorrectly* identify more than one category of drug — then the DRE protocol considers the officer's evaluation a success.[17]

---

[14] *Id.* at 235-38.

[15] *Id.* at 235 (citation omitted).

[16] *Id.* at 237 n.39; *Sampson*, 6 P.3d at 548 & n.4.

[17] *Sampson*, 6 P.3d at 549.

*The DRE protocol is scientific evidence subject to the Daubert/Coon standard*

Alaska's "'liberal admissibility standard' for expert testimony allows any person with specialized knowledge to serve as an expert witness," so long as the witness's testimony will "help the trier of fact understand [the] evidence or determine facts in issue."[18]  The trial court is vested with "broad discretion" to regulate expert testimony.[19]  When a party seeks to present expert testimony relating to scientific evidence, the testimony must satisfy the *Daubert/Coon* standard.[20]  By contrast, when an expert offers non-scientific testimony based on "other technical or specialized knowledge" that is "derived only from experts' personal experience and intuition" and is "not empirically verifiable or objectively testable," the testimony is not subject to *Daubert/Coon*.[21]  Instead, such testimony is admissible if "the expert witness has substantial experience in the relevant field and the testimony might help the jury."[22]

Bragaw's case presents an issue of first impression in Alaska:  whether the DRE protocol as a whole constitutes scientific evidence subject to *Daubert/Coon*.[23]  It

---

[18]  *Marron v. Stromstad*, 123 P.3d 992, 1002 (Alaska 2005) (quoting *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1034 (Alaska 2002)).

[19]  *Shepard v. State*, 847 P.2d 75, 79 (Alaska App. 1993).

[20]  *See Marron*, 123 P.3d at 1003-07 (limiting the applicability of the *Daubert* standard to expert testimony based on scientific theory).

[21]  *Id.* at 1006.

[22]  *Thompson v. Cooper*, 290 P.3d 393, 399 (Alaska 2012) (internal quotations omitted).

[23]  *See Baker v. State*, 2016 WL 7422695, at *3-4 (Alaska App. Dec. 21, 2016) (unpublished) (agreeing with the trial court that a defendant's challenge to the scientific validity of the DRE protocol was moot and expressing no opinion on the scientific validity of the drug recognition exam or whether it merits a *Daubert* hearing).

is uncontested that at least some portions of the DRE protocol are scientific. This Court has previously held that the horizontal gaze nystagmus test, which is included within step four of the DRE protocol, is scientific evidence.[24] Likewise, the final step of the protocol, which in Bragaw's case involved a toxicological analysis of Bragaw's blood by a forensic scientist, clearly involved "knowledge that has been 'derived by the scientific method.'"[25]

But the fact that individual steps may rely on the application of scientific principles does not in itself resolve the question of whether the protocol as a whole is scientific evidence. As the Alaska Supreme Court has observed, "there is often 'no clear line' dividing scientific from other technical or specialized knowledge."[26] Indeed, courts around the country are split on whether the DRE protocol — and most notably the officer's formal opinion as to whether the defendant is under the influence of drugs — qualifies as scientific evidence as opposed to technical knowledge based on an officer's training and experience.[27]

Several appellate courts, including those in Oregon, Washington, and Nebraska, have held that the DRE protocol is scientific evidence.[28] For example, in *State v. Sampson*, the Oregon Court of Appeals concluded that the DRE protocol was scientific

---

[24] *See Ballard v. State*, 955 P.2d 931, 941 (Alaska App. 1998), *overruled on other grounds by State v. Coon*, 974 P.2d 386 (Alaska 1999).

[25] *Marron*, 123 P.3d at 1004 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)).

[26] *Id.* at 1006 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)).

[27] *See* Seiders, *supra* note 9, at 241-58 (analyzing approaches courts around the country have taken to DRE evidence).

[28] *See State v. Sampson*, 6 P.3d 543, 548 (Or. App. 2000); *State v. Baity*, 991 P.2d 1151, 1157 (Wash. 2000); *State v. Daly*, 775 N.W.2d 47, 62 (Neb. 2009).

evidence because it "draws its authority from scientific principles," and several of its key components — including the horizontal gaze nystagmus test, vertical gaze nystagmus test, lack of convergence test, vital signs exam, and toxicological analysis — are "based on medical science."[29] "Each of those steps produces a test result that compares with results established through scientific research that purport to show the subject to be more or less likely under the influence of a controlled substance."[30] While other portions of the DRE protocol are "not clearly based on medical science," the officer's ultimate opinion is "heavily informed by data derived from the scientific portions of the protocol."[31] The Oregon court recognized that DRE testimony has "the potential to exert a significantly greater influence on the fact finder than nonscientific evidence," given its "highly specialized certification procedure, battery of medicalized tests, and complicated end-stage analysis."[32] Thus, "to the extent a DRE protocol is convincing on the issue of whether a defendant was under the influence of a controlled substance, that persuasive force emanates predominantly from the substance *and* the aura of the scientific principles on which its methodology is based."[33] "Although the protocol is a mosaic of scientific and observational techniques, their blending means that a juror's perception of the

---

[29]   *Sampson*, 6 P.3d at 550.

[30]   *Id.*

[31]   *Id.*; *see also Baity*, 991 P.2d at 1157, 1160 (concluding that the DRE protocol as a whole constitutes scientific evidence, even though many of the individual steps within the DRE are "largely observational").

[32]   *Sampson*, 6 P.3d at 550; *see also Daly*, 775 N.W.2d at 62 (characterizing the DRE protocol as "a systematic approach that considers a number of different factors" that allows an officer to form an opinion regarding the degree and source of a driver's impairment).

[33]   *Sampson*, 6 P.3d at 550 (emphasis in original).

validity of each component will likely be enhanced by the scientific imprimatur of the whole."[34]

As the State points out, some jurisdictions have reached the opposite conclusion, *i.e.*, that the DRE protocol does *not* constitute scientific evidence. In Bragaw's case, the trial court relied on the reasoning of the United States District Court for the District of Nevada, which concluded that the scientific roots of the DRE protocol did not render the protocol itself scientific.[35]

We agree with the reasoning of those courts that have concluded that the protocol as a whole constitutes scientific evidence.[36] As the Oregon court noted, the DRE "relies, for its legitimacy, on a cluster of published field and laboratory studies whose scientific patina naturally would have a tendency to influence lay persons."[37] The protocol's original development and ongoing validity depend upon the scientific knowledge of physicians and toxicologists to attribute specific physiological, pharmacological, and behavioral observations to particular controlled substances.[38] Indeed, we note that the national DRE certification board includes scientists and medical

---

[34] *Id.*

[35] *United States v. Everett*, 972 F. Supp. 1313, 1320 (D. Nev. 1997) ("All of the manifestations observed by the officer can be traced, ultimately to some scientific principle of physiology. That does not make the officer's testimony scientific."); *see also State v. Klawitter*, 518 N.W.2d 577, 585 (Minn. 1994) ("Drug recognition training is not designed to qualify police officers as scientists but to train officers as observers.").

[36] *See, e.g.*, *Sampson*, 6 P.3d at 550.

[37] *Id.*; *see also* Seiders, *supra* note 9, at 260-61; *State v. Baity*, 991 P.2d 1151, 1154 (Wash. 2000); *State v. Aleman*, 194 P.3d 110, 118 (N.M. App. 2008); *State v. Chitwood*, 879 N.W.2d 786, 797-99 (Wis. App. 2016).

[38] *Sampson*, 6 P.3d at 548; Seiders, *supra* note 9, at 233-40.

professionals as essential members — an indication of the importance of these other fields to the DRE protocol.[39]

We acknowledge, as have all other courts to address this issue, that many of the individual features of the DRE protocol would not amount to scientific evidence on their own.[40] But we agree with the Oregon court that blending scientific and observational techniques into a "systematized and standardized," multi-step procedure — conducted by an officer with a highly specialized certification who testifies to a "battery of medicalized tests" and then concludes with a "complicated end-stage analysis" as to the nature and origin of a defendant's impairment — creates a substantial likelihood that "a juror's perception of the validity of each component will likely be enhanced by the scientific imprimatur of the whole."[41]

For these reasons, we hold that, taken as a whole, the twelve-step DRE protocol is scientific evidence subject to the *Daubert/Coon* standard.

However, our holding today is a narrow one. We do not intend to suggest that officers cannot testify to their personal observations or to proper lay opinions.[42] But we leave for another day any effort to define the scope of such testimony.

---

[39] *See* Seiders, *supra* note 9, at 233-34; *Baity*, 991 P.2d at 1154.

[40] *See, e.g.*, *Sampson*, 6 P.3d at 550 (recognizing that some portions of the DRE protocol are "not clearly based on medical science"); *Baity*, 991 P.2d at 1157 (characterizing many of the DRE steps as "largely observational" rather than scientific).

[41] *Sampson*, 6 P.3d at 547, 550.

[42] *See* Alaska R. Evid. 602; Alaska R. Evid. 701.

*The trial court erred in admitting testimony about the DRE protocol without first fulfilling the court's gatekeeper duties under Daubert/Coon*

When a party raises a *Daubert/Coon* objection to scientific evidence, a trial court has "both the authority and the responsibility to determine the admissibility of such evidence."[43] The supreme court has described this as the court's "gatekeeper" duty,[44] and it requires the proponent of the scientific evidence to establish "the scientific validity of the analysis and/or the procedures that yielded this evidence."[45] A court may not simply "assume that the evidence is scientifically valid in the absence of evidence to the contrary."[46] In making this determination, courts should consider, among other relevant factors:

> (1) whether the proffered scientific theory or technique can be (and has been) empirically tested (*i.e.*, whether the scientific method is falsifiable and refutable); (2) whether the theory or technique has been subject to peer review and publication; (3) whether the known or potential error rate of the theory or technique is acceptable, and whether the existence and maintenance of standards controls the technique's operation; and (4) whether the theory or technique has attained general acceptance.[47]

---

[43] *State v. Coon*, 974 P.2d 386, 393 (Alaska 1999), *abrogated on other grounds by State v. Sharpe*, 435 P.3d 887 (Alaska 2019).

[44] *Id.* at 390.

[45] *Lewis v. State*, 356 P.3d 795, 800 (Alaska App. 2015).

[46] *Id.*

[47] *Coon*, 974 P.2d at 395 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)); *cf. State v. Aleman*, 194 P.3d 110, 117-20 (N.M. App. 2008) (discussing each of these factors in the context of admitting evidence of the DRE protocol under the *Daubert* standard).

Here, the trial court did not address any of these factors, nor did it hold the State to its burden of establishing the scientific validity of the DRE protocol. Instead, the court concluded that identifying Wertanen as an "evaluator," rather than as an "expert," and framing his conclusion as a "suspicion," rather than an "opinion," obviated the need for any judicial determination regarding the reliability and relevance of the trooper's proposed testimony.[48]

Regardless of the nomenclature attached to Wertanen's testimony, the underlying principles were the same, and as explained above, those principles were "'derived by the scientific method.'"[49] Accordingly, the trial court had "both the authority and the responsibility" to determine whether the proposed DRE evidence satisfied the *Daubert/Coon* standard.[50] Its failure to do so was error.

*The trial court also erred in excluding Bragaw's proposed expert testimony critiquing the DRE protocol*

The trial court also made a second, related error that compounded the first. After Wertanen's testimony about the DRE protocol, Bragaw's attorney sought to present her own expert witness's critiques of the DRE. Bragaw's expert would have opined that the DRE protocol was neither medically nor scientifically valid, and that the DRE observations did not support any conclusion about Bragaw's ingestion of, or impairment by, a controlled substance.

---

[48]   *Cf. State v. Baity*, 991 P.2d 1151, 1154 n.1 (Wash. 2000) (noting that it is "improper" for a court or the parties to refer to an officer with a DRE certification as an "expert" unless the officer is properly qualified as an expert under Evidence Rule 702).

[49]   *Marron v. Stromstad*, 123 P.3d 992, 1004 (Alaska 2005) (quoting *Daubert*, 509 U.S. at 590.)

[50]   *Coon*, 974 P.2d at 393.

The trial court expressed doubts that Bragaw's expert possessed the necessary qualifications to offer an opinion on this issue. But, the court ultimately did not resolve whether Bragaw's expert was qualified. Instead, it concluded that the reliability of the DRE protocol was not an issue before the court. In seeming contradiction to the earlier ruling that the DRE protocol was not scientific evidence, the court reasoned that the expert's critiques of the protocol were themselves scientific. According to the court, Bragaw therefore could not present this testimony without first establishing its scientific validity under *Daubert/Coon*.

A defendant is always entitled to challenge the validity of the State's evidence of guilt.[51] Even when a trial court finds that evidence is admissible, "it is the jury's task to determine the ultimate weight or credibility of the evidence."[52] Thus, a court's preliminary determination of admissibility does not foreclose either party from subsequently arguing the reliability and trustworthiness of the evidence to the jury: "[i]f the judge rules that the evidence is admissible, the party who opposed the admission of the evidence is still free to argue to the jury that the evidence is unreliable or not credible."[53] Especially when the State relies on scientific evidence, a trial court abuses its discretion when its rulings insulate the State's evidence from critique.[54] Because the

---

[51] *Cf. Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999) ("Although it is not absolute, a defendant's right to present a defense is a fundamental element of due process." (footnote omitted)).

[52] *Augustine v. State*, 355 P.3d 573, 581 (Alaska App. 2015).

[53] *Id.*

[54] *See Skamarocius v. State*, 731 P.2d 63, 65-66 (Alaska App. 1987) (concluding that a trial court abuses its discretion in excluding expert testimony "when the reasons for the exercise of discretion are clearly untenable or unreasonable").

exclusion of any critique of the DRE protocol deprived Bragaw of "a fair opportunity to flesh out [her] defense," the trial court's ruling was error.[55]

*The errors were not harmless*

The State argues that any error in admitting testimony regarding the DRE protocol was harmless.[56] According to the State, Wertanen testified only to his suspicions about the drugs Bragaw had *ingested*, rather than to an opinion about her impairment. Bragaw's ingestion of controlled substances was uncontested at trial: both her own admissions and the crime lab report confirmed her consumption of Librium. Therefore, the State argues, Wertanen's testimony that the DRE protocol likewise corroborated Bragaw's consumption of a controlled substance did not appreciably affect the jury's verdict.

It is true that, although the State filed a notice before trial indicating that Wertanen would offer an opinion that Bragaw "was too impaired to safely operate a motor vehicle" and that her impairment "was caused by drugs," the trooper's testimony at trial was more modest.[57] However, the record shows that Wertanen's testimony

---

[55]  *Shepard v. State*, 847 P.2d 75, 83 (Alaska App. 1993).

[56]  *See Love v. State*, 457 P.2d 622, 631 (Alaska 1969) (explaining that erroneous evidentiary rulings are harmless when a reviewing court can fairly say the error did not appreciably affect the verdict).

[57]  Although Wertanen did at one point admit that he had previously testified before the grand jury as to his opinion that Bragaw was impaired, he did so only in response to a leading question from Bragaw's attorney during cross-examination. Neither the trooper nor the State ever attempted to directly correlate the DRE results with any particular level of impairment. *Cf. State v. Wilson*, 337 P.3d 948, 955 (Or. App. 2014) (concluding that a defendant "cannot retroactively render the officer's opinion inadmissible by himself eliciting information from
(continued...)

repeatedly implied that Bragaw was impaired by central nervous system stimulants and depressants. For example, Wertanen explained that the drug recognition evaluation course taught him the observable signs in people impaired by various categories of drugs. He also told the jury that, based on the arresting officer's observations and Bragaw's breath alcohol level, he started to think that she was impaired by drugs or by a combination of drugs and alcohol. After explaining that only about ten percent of law enforcement officers in Alaska have a DRE certification, Wertanen told the jury that it was his job to conduct a drug recognition evaluation to determine whether a suspect is impaired by different categories of drugs. He also told the jury that a DRE evaluator forms an opinion of what drug the suspect has ingested or is impaired by. Wertanen repeatedly used the terms "impaired" or "impairment" when describing the protocol and what it is designed to test.

We believe this is significant to the question of harmlessness when considered in light of two other factors. First, Wertanen's testimony occupied over a third of the trial and included three separate discussions of the DRE protocol: an initial explanation of the DRE protocol in general; a tailored explanation of how Bragaw performed on each step; and then an audio recording of Bragaw's performance during the DRE. As the prosecutor noted in his closing argument, the jurors "heard a lot" about the DRE.

Second, the centrality of the DRE evidence to the presentation of the State's case created a substantial likelihood that the jury would perceive the validity of the individual portions of Wertanen's testimony — including even the purely observational portions — as enhanced by the scientific aura surrounding the DRE protocol as a whole.

---

[57] (...continued)
the officer on cross-examination that he now claims added a scientific flavor to the officer's testimony") (internal quotation omitted).

And although Bragaw was prepared to challenge the validity of the DRE protocol itself, both at a *Daubert* hearing and at trial by presenting her expert's opinion, the trial court did not permit this. We therefore cannot fairly say that the DRE protocol evidence did not appreciably affect the jury's verdict.[58]

We acknowledge that the limitations on the way that Wertanen was permitted to describe his opinion distinguishes this case, to some degree, from a typical case where an officer expressly testifies to their expert opinion that a defendant was impaired by drugs.[59] We also recognize that Wertanen was not the only witness to testify about Bragaw's demeanor and consumption of a depressant, and much of his testimony was corroborated by, and at times duplicative of, testimony provided by Tennis and the crime lab expert.

Nonetheless, we cannot find harmless the trial court's twin errors of allowing the presentation of scientific evidence without proof of its validity and then prohibiting Bragaw from challenging that validity.

---

[58]  *See Love*, 457 P.2d at 632.

[59]  *See, e.g.*, *State v. Aleman*, 194 P.3d 110, 112 (N.M. App. 2008) (noting that the DRE serves two primary purposes: to help officers identify impairment, and to identify the category of drugs that has caused the impairment); *cf. Baker v. State*, 2016 WL 7422695, at *3-4 (Alaska App. Dec. 21, 2016) (unpublished) (describing the DRE protocol as a "battery of twelve tests [that] purports to indicate the presence of drugs in the subject's body," but discussing the protocol in the context of an officer's opinion that the defendant was impaired); *Theriot v. State*, 2015 WL 4599593, at *2-3 (Alaska App. July 29, 2015) (unpublished) (describing a "drug recognition expert" as "a police officer who had undergone special training to recognize the symptoms attributable to various categories of drugs, and then to diagnose what types of drugs a person has ingested, based on those observed symptoms," within the context of an officer's opinion that the defendant's level of impairment was attributable to "untestable controlled substances" as well as marijuana).

*Conclusion*

For the reasons explained in this opinion, we REVERSE Bragaw's conviction for felony driving under the influence and REMAND for a new trial. Prior to allowing the State to present evidence regarding the DRE protocol, the trial court must determine whether the DRE meets the standard for admissibility of scientific evidence under *Daubert/Coon*.